**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. _____**

|  |  |  |
|---|---|---|
| JOSE JAVIER PEREZ, individually and on behalf of all others similarly situated, | ) ) ) ) | CLASS ACTION |
|  | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) ) |  |
| vs. | ) ) |  |
| TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA MOTOR CORPORATION, and SOUTHEAST TOYOTA DISTRIBUTORS, LLC, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

**CLASS ACTION COMPLAINT**

Plaintiff Jose Javier Perez ("Plaintiff"), on behalf of himself and all other similarly situated members of the below-defined Nationwide Class and Florida Class he respectively seeks to represent (collectively, the "Class"), brings this action against Defendants Toyota Motor Corporation ("TMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Toyota Defendants") and Southeast Toyota Distributors, LLC ("SET") (collectively with Toyota, the "Defendants"), upon personal knowledge as to the factual allegations pertaining to himself and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    INTRODUCTION

1.    Plaintiff brings his claims individually and on behalf of all persons or entities in the United States who purchased or leased a 2006-2020 Toyota Prius, 2017-2020 Toyota Prius Prime,

2010-2015 Toyota PHV, 2012-2016 Toyota Prius C, and 2012-2017 Prius V (the "Class Vehicles" or "Vehicles"), all of which were delivered by Toyota with an identical and inherent design defect in the Vehicle's Heating, Ventilation, and Air Conditioning System (the "Defective HVAC System").

2.      The defect, which was latent, but existed at the time that the Class Vehicles left Defendants' possession and control, permits the accumulation of moisture and microbial growth within the HVAC system, causing it to emit foul, noxious, and/or toxic odors into the Vehicle's passenger compartments and exposing the Vehicle's occupants to a safety risk from the mold and other contaminants that are emitted in the air circulated through the Defective HVAC System (the "HVAC Defect" or "Defect").

3.      One unsuspecting Prius owner described the odor as "an overpowering urine smell coming out of [his] vents," posting that "somehow an animal must have gotten into the engine, urinated and the urine and bacteria has built up somewhere in the car," exclaiming that "[it] is awful and that everyone rides in my car smells it."  Others describe the odor as smelling like a pile of rank, sweaty socks.

4.      It is therefore no surprise that the HVAC Defect has resulted in numerous complaints to the National Highway Transportation Safety Administration ("NHTSA"), distributors, and Toyota dealerships across the country, as well as directly to Defendants themselves.  Toyota has issued numerous Technical Service Bulletins ("TSBs") to its exclusive network of distributors and dealerships describing the foul, noxious, and/or toxic odors being emitted from the Defective HVAC Systems and collaborated with the Defective HVAC System supplier DENSO International, Inc. ("DENSO"), distributors like SET (collectively "Distributors"), and Toyota dealerships and other independent dealerships ("Dealers") to conceal the Defective HVAC

System, while passing on to consumers, including Plaintiff and Class members, the costs to inspect, diagnose, and/or ameliorate the resultant foul, noxious, and/or toxic odors.

5.     Toyota and SET have long been aware of the HVAC System Defect but have concealed the Defect from Plaintiff, Class members, and the public. For example, based on the research and technical knowledge of Toyota Motor Engineering & Manufacturing North America, Inc. (the automobile engineering, manufacturing, research, and design concern in North America for Toyota motor vehicles), TMS published a course manual on air conditioning and climate control that TMC approved in which the Toyota Defendants admitted that Toyota HVAC system odors are "a common complaint among users" and that the odors are caused by, *inter alia*, "[m]icrobes [*i.e.*, mold] growing on the evaporator surface" including "small living bacteria . . . carried into the evaporator case [that] grow in the warm, moist environment." SET also communicated with Toyota on multiple occasions regarding customer complaints as to the foul, noxious, and/or toxic odors from the Defective HVAC System. Thus, consumers, including Plaintiff and Class members, were knowingly sold vehicles that Defendants knew would accumulate mold and/or emit foul, noxious, and/or toxic-smelling odors.

6.     According to the World Health Organization ("WHO"), "[h]ealthy indoor air is recognized as a basic right," and exposure to mold can result in allergies, asthma, respiratory issues, upper respiratory problems, and immunological reactions. Thus, Plaintiff and Class members have been exposed to a real and serious health and safety hazard as a result of Defendants' wrongful conduct.

7.     Despite issuing several TSBs to its exclusive network of Distributors and Dealers, Toyota conspired with SET to keep information of the HVAC System Defect from consumers, including Plaintiff and Class members, so that Toyota and SET could misrepresent the standard,

quality, and/or grade of the Class Vehicles and knowingly, actively, and affirmatively omit and conceal the existence of the Defective HVAC System to increase their profits by selling additional Vehicles and charging consumers for special filters, HVAC servicing, and other "repair" fees when consumers complained of the foul, noxious, and/or toxic odors.

8.      Knowledge and information regarding the Defective HVAC System and associated health and safety hazard the HVAC System Defect posed to Vehicle occupants was in the exclusive and superior possession of Toyota, Distributors, including SET, and Dealers, and was not provided to Plaintiff and Class members, who could not reasonably discover the Defect through due diligence. Based on, amongst other things, consumer complaints to Toyota, Distributors, Dealers, and NHTSA, Defendants were aware of the Defective HVAC System and fraudulently failed to disclose such information about the Defect to Plaintiff and Class members.

9.      Notwithstanding this knowledge, TMS continued selling Class Vehicles with the Defective HVAC System, TMC continued to direct and/or approve of continued production and sales of the defective Vehicles, SET continued to distribute Class Vehicles to Dealers, and Dealers continued to sell Class Vehicles with the Defective HVAC System to consumers, including Plaintiff and Class members. Indeed, Toyota and SET conspired to conceal the knowledge of this Defect and failed to disclose the existence of the Defective HVAC System to Plaintiff and Class members.  Additionally, Toyota has refused to issue a recall and has not remedied the Defect and/or compensated Plaintiff or Class members for their damages resulting from the material Defect.  Rather, Defendants wrongfully and intentionally concealed information about the Defective HVAC System from Plaintiff and Class members.

10.     No reasonable consumer expects to purchase or lease a vehicle that contains a Defective HVAC System that emits foul, noxious, and/or toxic odors into the vehicle's passenger

compartment or emits mold and other contaminants into the vehicle, posing a health and safety hazard to vehicle occupants. The Defect is material to Plaintiff and Class members. When Plaintiff and Class members purchased or leased their Class Vehicles, they reasonably relied on their reasonable expectation that the Class Vehicles would be free from defects and would not emit foul, noxious, and/or toxic odors into the Class Vehicles' passenger compartments or pose a health and safety hazard to Class Vehicle occupants.

11.     Had Defendants disclosed that the HVAC system in the Class Vehicles was defective and would emit foul, noxious, and/or toxic odors into the Vehicles' passenger compartment or pose a health and safety hazard to its occupants, Plaintiff and Class members would not have purchased or leased their Vehicles or would have paid significantly less for their Vehicles.

12.     As a result of the Defective HVAC System and Defendants' concealment thereof, Plaintiff and Class members overpaid for their Class Vehicles, did not receive the benefit of their bargains, were exposed to foul, noxious, and/or toxic odors and a health and safety hazard, and were forced to incur additional expenses in an attempt to remedy the Defective HVAC System in their Class Vehicles.

13.     To the extent Defendants have offered or provided odor mitigation to the Class Vehicles pursuant to the TSBs or otherwise, those mitigation attempts have not provided permanent repairs and the Vehicle's HVAC system remains defective. Toyota has long-acknowledged this fact, and continue to advise Dealers in the most recent TSB it issued in March 2020: "NOTE[:] The procedure in this bulletin will NOT eliminate the odors described but is provided to help reduce intensity of the odors."

14.     Plaintiff and Class members assert claims for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), fraudulent concealment, unjust enrichment, violation of the Magnuson-Moss Warranty Act, breach of express and implied warranties, and violation of the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §501.201, *et seq.*

15.     As a direct result of Defendants' wrongful conduct, Plaintiff and Class members have been harmed and have suffered actual damages, including overpayment for their Class Vehicle, loss of use of their Class Vehicle, costs, and lost time associated with bringing in their Class Vehicle for diagnosis, repair, and replacement of components, and the actual costs of diagnosis, repair, and replacement components to address or repair the Defective HVAC System.

## II.     JURISDICTION AND VENUE

16.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.  Jurisdiction is also proper in this Court, pursuant to 28 U.S.C. § 1331, because Plaintiff's RICO claims arise under federal law.  This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. §1367 and jurisdiction over the Magnuson-Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

17.     Venue properly lies in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(a), (b) and (c) because: a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; Defendants conduct a substantial amount of business in this District; and, at all relevant times, SET was headquartered in this District.  Accordingly,

Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction in this District and venue is proper.

### III.   PARTIES

#### A.   Plaintiff

18.    Plaintiff is a citizen of Florida, residing in Winter Garden, Florida.  Plaintiff purchased a new 2020 Toyota Prius Prime on August 5, 201, at Central Florida Toyota-Scion (the "Dealership"), an authorized Toyota dealer in Orange County, Florida.  Plaintiff purchased his Class Vehicle for personal, family, or household purposes, and continues to own the Vehicle.

19.    Prior to purchasing the Class Vehicle, Plaintiff heard, viewed, and/or read Toyota marketing materials that touted the quality, efficiency, and comfort of Toyota's vehicles, including the Class Vehicle, and the sales representative and/or other personnel at the Dealership emphasized the quality, efficiency, and comfort of the Class Vehicle.  Plaintiff relied on the information regarding the quality, efficiency, and comfort of the Class Vehicle conveyed in Toyota's marketing commercials and by the sales representative, as well as the warranty information provided by the sales representative, in deciding to purchase his Class Vehicle.

20.    Within a week of purchasing his Class Vehicle, Plaintiff began noticing a foul odor emanating from the air-conditioning ("A/C") vents of the Class Vehicle.  At first, Plaintiff thought it was just a weird "new car smell" that would dissipate over the next couple of weeks. The foul odor did not dissipate, however, and instead, the odor emanating from the Class Vehicle's A/C vents became moist and increasingly more-foul as the Summer approached.

21.    Indeed, Plaintiff recalls that a few months after purchasing his Class Vehicle his son, who suffers from asthma and is sensitive to noxious smells, began complaining of a foul odor emanating from the A/C vents of the Class Vehicle while riding in the Vehicle's passenger seat.

7

At first, Plaintiff blamed the smell on his son's shoes, but over time Plaintiff began to observe a "humid" smell emanating from the A/C vents of the Class Vehicle that increasingly smelled like wet socks over the Summer.

22.     Plaintiff did not suspect that the foul odor was being caused by a Defective HVAC System, and instead, believed that he or other occupants of the Class Vehicle had somehow caused the smell by, for example, leaving food in the Vehicle.   After thoroughly cleaning his Class Vehicle, the smell diminished, but then returned in full force and continued to persist.   Given that Plaintiff did not know at the time that Toyota was responsible for the foul odor (by virtue of selling his Class Vehicle with the Defective HVAC System), he believed his only solution to reduce the odor was to drive his Class Vehicle with the windows down, wash and vacuum his Vehicle every few days, and constantly use cleaning products and other odor reducers.

23.     The foul odors described above have continued to emanate from the Defective HVAC System on a periodic basis since Plaintiff purchased his Class Vehicle, and those odors continue to emanate from his Vehicle's A/C vents to this day.

24.     Defendants failed to disclose the Defective HVAC System to Plaintiff before he purchased his Class Vehicle, despite their knowledge of the Defect, and Plaintiff, therefore, purchased his vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.   Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Defective HVAC System and its emission of foul, noxious, and/or toxic odors or mold.

25.     Given the Defect, Plaintiff has been exposed to foul, noxious, and/or toxic odors emitted from the Defective HVAC System in his vehicle when using or turning off the air conditioner.   Since the Dealership is unable to remedy the problem in his Class Vehicle, Plaintiff

has been left without recourse and continues to experience foul and noxious odors emanating from the Defective HVAC System when operating his Vehicle.

26.     Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Defendants' misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Defective HVAC System, and he has had to pay out-of-pocket expenses to remedy the Defect (which have not resolved the issue).

27.     None of the advertisements reviewed or representations received by Plaintiff or Class members contained any mention or disclosure of the Defective HVAC System and its associated health and safety hazard.

28.     Neither Toyota nor any of their agents, Distributors, including SET, Dealers, or other representatives informed Plaintiff and Class members of the HVAC System Defect and its associated health and safety hazard prior to Plaintiff's and the Class members' purchase or lease of the Class Vehicles.

29.     When Plaintiff and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an HVAC system that was free from defects, safe to operate, and would not pose a threat to their health or safety.  In fact, Defendants have always emphasized the quality and reliability of the Class Vehicles, knowing that consumers, including Plaintiff and Class members, rely upon such representations when purchasing or leasing vehicles.  Had Defendants disclosed that the Defective HVAC System in the Class Vehicles could lead to the emission of foul, noxious, and/or toxic odors and air filled with mold and other contaminants into the passenger compartment, posing a health

and safety hazard to vehicle occupants, Plaintiff and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

30.     Plaintiff and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used.  Plaintiff and Class members have suffered an ascertainable loss as a result of Defendants' unfair and deceptive conduct, breach of common law and statutory duties, and omission and/or misrepresentations associated with the Defective HVAC System and its associated health and safety hazard, including but not limited to, out-of-pocket losses and diminished value of their Vehicles.

**B.**     **Defendants**

31.     TMC is the world's largest automaker and largest seller of automobiles in the United States.  TMC is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.  TMC is the parent company of TMS and conducts business in this District.

32.     TMS is a California corporation with its principal place of business in Plano, Texas. TMS is responsible for the manufacture, distribution, and sale of all Toyota vehicles in the United States.

33.     SET is a Florida limited liability company with its headquarters located at 100 Jim Moran Boulevard, Deerfield Beach, Florida 33442.

34.     SET distributes Toyota vehicles, parts, and accessories to Dealers located in Florida, Georgia, Alabama, North Carolina, and South Carolina. SET is the largest independent distributor of Toyotas in the United States. Vehicles manufactured by Toyota in North America and Japan are processed at SET's facilities in Jacksonville, Florida. SET also supports Dealers through regional sales and marketing, customer service, accessory development, and sales. In 2016, SET was number two in total dealer profits for Toyota vehicles and number one in the region

in Toyota Certified Used Vehicle sales. SET is also the leading distributor of Toyota parts and accessories in the United States. Finally, SET hosts one of the largest automotive training and technical support facilities for Toyota Dealers in its region, and SET provides close to 100,000 hours of training on maintenance education and diagnostic assistance and advice to Toyota Dealers, including training and assistance on Toyota's Defective HVAC System. At all relevant times, SET acted through its authorized agents and representatives in its Dealer network while performing activities associated with advertising, marketing, and selling Class Vehicles and providing warranties, warranty repairs, and dissemination of technical information and mechanic training materials.

35.     At all times relevant to this action, Defendants manufactured, distributed, sold, leased, and/or warranted the Class Vehicles under the Toyota brand name throughout the United States.

36.     Toyota developed and disseminated the owner's manuals, warranty booklets, maintenance schedules, advertisements, and other promotional and technical materials relating to the Class Vehicles to Toyota Distributors (including SET) and Dealers, which were then disseminated to Plaintiff and Class members.

## IV.     FACTUAL ALLEGATIONS

### A.     The Defective HVAC System

37.     A basic air conditioning system, such as the HVAC system in the Class Vehicles, contains components to push refrigerants through a closed system to extract heat out of the vehicle interior and transfer that heat to the outside air during which process the refrigerant changes from a liquid to a gas and then back to a liquid.

38.     As shown below, the HVAC system has a high-pressure side (shown in red), which includes the compressor, condenser and the receiver/drier, and a low-pressure side (shown in blue), which includes the expansion valve and the evaporator.  The expansion valve controls the flow and pressure of liquid refrigerant into the evaporator, and a blower draws air through the evaporator to cool and dehumidify the interior air.  As cold refrigerant passes through into the evaporator, it absorbs heat from the air and produces condensation, which is intended to drain from the HVAC system through a rubber hose onto the ground.



39.     However, the Defective HVAC System in the Class Vehicles fails to adequately remove or drain the condensed water from the evaporator and surrounding enclosure, trapping the water in the Defective HVAC System.  The resultant moisture creates an environment susceptible to the growth of mold and other contaminants and leads to the development of a foul, noxious, and/or toxic odor and mold and other contaminants, which are emitted into the passenger compartment of the Class Vehicles by the blower.

40.     In 2004, the Institute of Medicine ("IOM") found there was sufficient evidence to link indoor exposure to mold: with upper respiratory tract symptoms, coughing, and wheezing in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition. The IOM also found limited or suggestive evidence linking indoor mold exposure and respiratory illnesses in otherwise healthy children. Other studies have shown a potential link between mold exposure and the development of asthma in children.

41.     According to the WHO's Guidelines for Indoor Air Quality: Dampness and Mold, "[m]icrobial pollution involves hundreds of species of bacteria and fungi that grow indoors when sufficient moisture is available" and "[e]xposure to microbial contaminants is clinically associated with respiratory symptoms, allergies, asthma and immunological reactions."

42.     No reasonable consumer expects to purchase or lease a vehicle with a HVAC System Defect that exposes them to foul, noxious, and/or toxic odors, mold, and other contaminants.  Further, Plaintiff and Class members do not reasonably expect Toyota and its Distributors (including SET) to conceal a defect in the Class Vehicles or conceal a known health and safety hazard.  Plaintiff and Class members had no reasonable way to know that Class Vehicles contained Defective HVAC Systems, which were defective in materials, workmanship, design, and/or manufacture and posed a serious and real health and safety hazard.

43.     As a result of Defendants' material misrepresentations and omissions, including their failure to disclose that the Class Vehicles contain an HVAC System Defect, Plaintiff and Class members paid more for their Class Vehicles than they would have and suffered other actual damages, including but not limited to, out-of-pocket expenses, diminished value of their vehicles, and exposure to foul, noxious, and/or toxic odors and mold and other contaminants.

B.    **Defendants' Knowledge of the Defective HVAC System**

44.    Defendants fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiff and Class members the Defect in the Class Vehicles even though Defendants knew of the Defective HVAC System in the Class Vehicles.

45.    Knowledge and information regarding the Defective HVAC System were in the exclusive and superior possession of Toyota, its Distributors (including SET), and Dealers, and that information was not provided to Plaintiff and Class members.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Toyota and it's of exclusive Dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to NHTSA, and testing performed in response to consumer complaints, *inter alia*, Defendants were aware of the Defective HVAC System in the Class Vehicles and fraudulently concealed the defect and safety risk from Plaintiff and Class members.

46.    Defendants fraudulently and intentionally omitted and concealed from Plaintiff and Class members the HVAC System Defect in the Class Vehicles, even though Defendants knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

47.    Defendants knew that the Defective HVAC System and the associated safety risk was material to owners and lessees of the Class Vehicles and neither known nor reasonably discoverable by Plaintiff and Class members before they purchased or leased Class Vehicles or within the applicable warranty periods.

48.    Notwithstanding Defendants' exclusive and superior knowledge of the Defective HVAC System, Defendants failed to disclose to and intentionally concealed the Defect from

14

consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continue to sell Class Vehicles containing the Defect.

<strong><em>i.      TSBs Identifying the Defective HVAC System</em></strong>

49.     The potential for HVAC odor has long been a known issue to Defendants even outside the context of the Class Vehicles at issue here.

50.     As early as 1997, Toyota issued a TSB AC002-97, titled "Air Conditioning Evaporator Odor," that explicitly acknowledged the presence of microbial growth in the HVAC evaporator caused by dampness in the housing, describing the result as a "musty odor ... emitted from the air conditioning system of some vehicles which are usually operated in areas with high temperature and humidity." This TSB noted that the odor could result from "[b]lockage of the evaporator housing drainpipe, resulting in the buildup of condensate" or "[m]icrobial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified."

51.     On or around August 6, 2009, Toyota issued T-SB-0261-09, titled HVAC Odor, which specifically related to HVAC odors for 2004-2008 model year Prius and 2007-2010 model year Camry vehicles.  The TSB stated: "Some Camry, Camry HV, and Prius models may exhibit an intermittent HVAC system odor.  A newly designed evaporator sub-assembly has been made available to decrease the potential for HVAC odor." T-SB-0261-09 further stated that "[t]his repair is covered under the Toyota Comprehensive Warranty… in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date."

52.     On or around November 29, 2011, Toyota issued a revision to the August 6, 2009, T-SB-0261-09 Rev1, updating production change information and again informing dealers that a newly designed evaporator sub-assembly had been made available to decrease the potential for

HVAC odor.  The revised TSB again stated that "[t]his repair is covered under the Toyota Comprehensive Warranty…in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date."  It also noted, however, that "[w]arranty application is limited to occurrence of the specified condition described in this bulletin.

53.     On or around September 12, 2013, Toyota issued T-SB-0142-13, titled HVAC Odor Maintenance, which explicitly informed its dealers that the HVAC odors were normal, "naturally occurring from the HVAC system and/or related environmental factors."  In addition, the TSB, which identified the Defective HVAC System in Prius and Camry vehicles through model year 2014, explicitly informed dealers that "*there is no way to eliminate these odors*" and instructed them to "follow the General Procedure in this bulletin to minimize the odors experienced."  To ensure that its dealers where abundantly clear on this point, Toyota stated above the first step of the "General Procedure" dealers were to follow:

> **NOTE**
>
> **This procedure will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors.**

54.     Toyota updated T-SB-0142-13 on April 9, 2015 to include model year 2015 Prius and Camry vehicles and, again, on November 10, 2016, to include model years 2016-2017 of those vehicles.  Although Toyota updated the November 10, 2016 TSB on or around February 6, 2020, to exclude 2016 and 2017 model year Prius vehicles; on or around March 10, 2020, Toyota issued T-SB-0022-20, also titled "HVAC Odor Maintenance," which not only included those model year vehicles, but also added model year 2018-2020 Prius vehicles.

55.     Like the prior TSBs on this issue, it states that HVAC System odors are "naturally occurring" and advises Distributors and Dealers to "[f]ollow the General Procedure in this bulletin to minimize the odors experienced."  The TSB also includes detailed steps for Distributors and

Dealers to follow regarding the A/C Evaporator Cleaning Procedure With Toyota Genuine A/C Refresher Kit, which are also included in a Tech Tip issued by Toyota on October 15, 2019 (T-TT-0577-19).

56.     While Dealers and Distributors, including SET, received copies of the above-described TSBs, Plaintiff and Class members never received copies of or the information contained in the TSBs described above. Upon information and belief, the TSBs were not directly communicated to consumers, including Plaintiff and Class members. Thus, despite Defendants' knowledge of the HVAC System Defect and associated health and safety hazard, which Defendants recognized was present in Class Vehicles, Defendants failed to disclose the HVAC System Defect to owners and lessees of the Class Vehicles, including Plaintiff and Class members, and instead, intentionally concealed the HVAC System Defect. Moreover, Defendants failed to provide an effective remedy for or replacement of the Defective HVAC System.

*ii.* ***TSBs Identifying the Defective HVAC System***

57.     Toyota knew about the Defective HVAC System in the Class Vehicles based on the voluminous complaints consumers filed with NHTSA and elsewhere.

58.     Consumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA that identify the Defective HVAC System and detail their experience with the symptoms it causes.

59.     Federal law requires Toyota to monitor defects which can cause a safety issue and report them within five (5) days.  Toyota regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the Defect through these complaints.  Toyota also had knowledge of the Defect in the Class Vehicles through

17

complaints made by owners and lessees of other Toyota vehicles, including the Toyota Camry, which contains the same Defective HVAC System.

60.    Below are excerpts of a small sample of consumer complaints made to NHTSA regarding the Defective HVAC System:

- **June 26, 2002 – 1999 Toyota Camry**

  *THE AIR CONDITIONER SMELLS WHEN USING IT. IT SMELLS LIKE MOLD. II [sic] HAVE TAKEN IT TO THE DEALER, BUT ALL THEY DO IS SPRAY IT WITH FRIGI-FRESH, WHICH ONLY MASKS THE SMELL FOR A SHORT WHILE.*

- **September 20, 2004 – 2001 Toyota Camry**

  *MY WIFE'S 2011 TOYOTA CMRY [sic] HAS AN AIR CONDITIONER ODOR. WE HAVE BEEN LEAD [sic] TO BELIEVE THAT IT MAY BE CAUSED BY THE A/C GETTING TOO COLD, FREEZING UP, AND ACTUALLY CAUSING MOLD IN THE A/C SYSTEM.* SHE HAS DRIVEN THE CAR FOR 2 1/2 YEARS AND NOW HAS CANCER. WE HAVE BEEN UNABLE TO DO ANYTHING TO RID THE CAR OF THE ODOR. DOESN'T EXPOSURE TO MOLD, IF SO, CAUSE HEALTH PROBLEMS? WE SPENT A YEAR TRYING TO LOCATE AN ODOR IN THE CAR. REPLACED MATS, DETAILED THE UPHOLSTRY, ETC.

- **February 13, 2007 – 2002 Toyota Camry**

  MY 2002 CAMRY HAS BEEN A GREAT CAR *EXCEPT FOR THE FOUL ODOR COMING FROM THE AIR CONDITIONER. I HAVE CONTACTED THE DEALER AS WELL AS TOYOTA ABOUT THIS PROBLEM SEVERAL TIMES BUT NOTHING HAS BEEN FIXED.* WE ARE STILL DEALING WITH THE ODOR FROM THE AIR CONDITIONER.

- **October 18, 2018 – 2000 Toyota Camry**

  *I HAD A PASSENGER WHO REMARKED THAT THERE WAS A SULFUR SMELL IN PASSGENER [sic] COMPARTMENT OF CAR WHEN RECIRCULATION*

*AIR IS SWITCHED ON.* I HAD NOTICED IT BEFORE BUT DIDN'T KNOW WHAT TO THINK ABOUT IT. *I'VE HAD LOTS OF MIGRAINE HEADACHES OVER THE PAST 5 MONTHS.* WHEN I MENTIONED TO A MECHANIC HE SAID IT WAS PROBABLY DUE TO THE SULFUR DIOXIDE POISONING ME.

- **September 22, 2013 – 2010 Toyota Camry**

  *WHEN I OPERATE MY HEAT OR AIR CONDITIONING IN MY 2010 TOYOTA CAMRY I GET A STRONG SMELL OF SULFUR IN THE PASSENGER COMPARTMENT OF MY CAR.* I OWNED MY CAR FOR 4 YEARS NOW AND THE PROBLEM STARTED ABOUT 3 YEARS AGO. NO ONE CAN TELL ME THE EXACT CAUSE OF THE PROBLEM.

- **February 26, 2014 – 2013 Toyota Camry**

  2013 TOYOTA CAMRY. CONSUMER WRITES IN REGARDS [sic] TO HVAC ASSEMBLY AND AC SYSTEM ISSSUES. *SMD THE CONSUMER STATED THE VEHICLE WAS TAKEN TO THE DEALER ON 4 SEPARATE OCCASSIONS, FOR THE ODOR ISSUE COMING FROM THE AC AND THE MILDEW AND FUNGUS GROWTH IN THE PADDING AND CARPET.

- **May 17, 2014 – 2012 Toyota Camry**

  *FOR THE PAST SEVERAL MONTHS MY 2012 CAMRY A/C UNIT RELEASES A FOUL MILDEW ORDER [sic]. IN-PASSENGER COMPARTMENT FILTER AS WELL AS OZONE DEPLETION SPRAY WAS COMPLETED TWICE OVER THE SPAN OF ONE WEEK AT CROWN TOYOTA, HOWEVER THE FOUL SMELL SHORTLY REAPPEARS WHEN THE CAR IS TURNED ON.*

- **November 23, 2014 – 2014 Toyota Camry**

  *WHEN STARTING VEHICLE AND TURNING ON A/C A VERY FOUL ODOR OF MILDEW AND MOLD COMES FROM THE VENTS. WE HAVE TAKEN IT BACK TO THE DEALERSHIP FOR A CLEANING AND REPLACED THE FILTER WITH A CARBON ONE AT THE DEALERSHIP AT OUR EXPENSE. THIS DID NOT FIX THE ISSUE.* WE FOLLOW

INSTRUCTIONS OF FUNNING [sic] AC IN NON RECIRCULATING [sic] MODE TO NO AVAIL. TOYOTA DOES NOT SEEN [sic] TO WANT TO TAKE OWNERSHIP OF THE ISSUE. I AM CONCERNED OF [sic] OUR HEALTH FROM INHALING THESE MOLD SPORES AND BACTERIA.

- **December 4, 2015 – 2013 Toyota Camry**

  CAR HAS ONLY 17000 MILES. ***TERRIBLE ODOR FROM THE A/C AND HEATING VENTS. DEALER RECOMMENDS A CLEANER AND FILTER CHANGE COSTING ME 140.00 DOLLARS.*** WHY IS THIS SMELL HAPPENING? IS IT MOLD? VERY UNHEALTHY.

- **December 19, 2015 – 2012 Toyota Camry Hybrid**

  STRONG MOLD SMELL FROM AIR VENTS. ESPECIALLY STRONG FOR FIRST 15 MINUTES OF DRIVING.

- **June 9, 2016 – 2014 Toyota Camry Hybrid**

  PURCHASED A 2014.5 [sic] TOYOTA CAMRY XLE HYBRID ON NOVEMBER 3, 2014. ***RECENTLY, THE VEHICLE EMITS A FOUL ORDER [sic] WHEN THE AIR CONDITIONER IS TURNED ON. I TOOK IT TO A LOCAL DEALERSHIP WHO TRIED TO TELL ME THAT ALL CARS HAVE THIS PROBLEM.*** I SEE THERE IS A CLASS ACTION LAWSUIT FOR 2012 MODEL YEAR VEHICLES, AND TOYOTA IS STILL PRODUCING VEHICLES WITH THIS PROBLEM. THE DEALERSHIP OFFERED TO DO A FORM CLEAN OF THE SYSTEM AND INSTALL A CHARCOAL FILTER FOR THE TUNE OF $150 WITHOUT ANY GUARANTEE THAT WHIS [sic] WOULD EVEN FIX THE PROBLEM.

- **October 19, 2017 – 2017 Prius Plug-In Hybrid**

  THE AIR CONDITIONER EMITS A FOUL SMELL WHEN STARTING AND WHILE DRIVING. HAVE MANY NEW CARS AND NEVER HAD THIS CHRONIC PROBLEM. TOOK THE CAR TO THE DEALER AND WAS TOLD THAT THIS WAS A RECURRING PROBLEMS WITH TOYOTA. TRADED IN 2015 PRIUS

20

WITH 36000 MILES FOR THE PRIUS PRIME AND NEVER HAD A [sic] AIR CONDITIONING PROBLEM WITH THAT PRIUS.

- **December 2, 2017 – 2016 Prius**

   UPON START UP THIS TOYOTA PRIUS VEHICLE ***EMITS FOUL SMELLING CHEMICAL AIR INTO THE CABIN OF THE VEHICLE. IT IS UNKNOWN HOW TOXIC THESE SMELLS ARE BUT AGGRAVATE RESPIRATORY CONDITIONS AND ASTHMATIC CONDITIONS. TOYOTA ACKNOWLEDGES THAT THEY HAVE A SERVICE BULLETIN WITH "THOUSANDS" OF COMPLAINTS FROM CONSUMERS REPORTING NOXIOUS AIR BEING EMITTED INTO THE CABIN OF THE VEHICLE.*** HOWEVER THEY ARE REQUIRING CONSUMERS TO PAY FOR FIXES, EVEN IF THE CONSUMER HAS A FULL WARRANTY FOR MANUFACTURER DEFECTS. THIS VEHICLE ONLY HAS ABOUT 9.2K MILES ON IT (2016) AND IS GETTING WORSE. THE PROBLEM ALWAYS HAPPENS ON VEHICLE START UP WHEN AT REST, ESPECIALLY IN WARM AMBIENT CONDITIONS. THE AC WILL BE FOUL AND NOXIOUS. IN COLD TEMPERATURES THE FIRST FEW MINUTES OF HEATING WILL ALSO EMIT FOUL AND NOXIOUS ODORS. SERVICE LINE AT DEALERSHIP ACKNOWLEDGE THESE COMPLAINTS ARE HERE BUT WILL NOT EFFECT REPAIRS UNDER DIRECTION OF TOYOTA CORPORATE. ALL REPAIRS FOR MANUFACTURING DEFECT FOR TOXIC AIR HAVE TO BE PAID FOR BY THE CUSTOMER.

- **August 18, 2017 – 2012 Prius V**

   WHILE DRIVING VARIOUS SPEEDS, THE AIR CONDITIONER WAS ACTIVATED AND THERE WAS A STRONG ODOR IN THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER . . . WHERE IT WAS DIAGNOSED THAT THE ODOR WAS DUE TO MOLD. THE DEALER CLEANED THE VENTS AND THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED SEVERAL OTHER TIMES. THE VEHICLE WAS TAKEN TO THE SAME DEALER, BUT THEY USED THE SOLUTION TO CLEAN THE VENT THE

SECOND TIME. THE VEHICLE WAS REPAIRED, BUT
THE FAILURE STILL OCCURRED.

61.     Owners and lessees of the Class Vehicle have also complained about the Defective

HVAC System on various Internet forums:

- **Carcomplaints.com – September 1, 2015 – 2015 Prius C**

  I had a Prius C 2013 before and it had the smell kind of
  smell whenever I turned on the A/C or just the fan. I took it
  to the dealership and they said it was because lots of dust
  was collected in there. Now I have another Prius C 2015 for
  just 4 months and I notice the same smell came back about
  a month ago. What could really be the cause? It smells so
  bad that I rather have the windows open instead of turning
  on the A/C.

- **Cargurus.com – November 4, 2016 – 2015 Prius C**

  Anyone else experiencing the mold smell from vents. Worse
  on humid days. Bought a brand new 2015 and it started
  smelling of mold around 5,000 miles. They have done all the
  useless stuff like changing the cabin filters and cleaning the
  evaporator hose etc. Now they are saying that Toyota says
  customers should pay over $100[.]00 every 10,000 miles to
  change the cabin filter and do the cleaning kit in evap hose
  [sic]. They are also saying they know this is not a total fix
  but it might help control the odor. MOLD IS DANGEROUS.
  I have never had headaches, sinus issues and skin breakouts
  like I have since buying this Prius. I LOVE the car but can't
  handle this smell. I've also been told to turn the air
  conditioner off and the recirculate air off before turning the
  car off. This does appear to help to only a certain degree
  (when I remember to do it) but other times it doesn't seem
  to make a difference. Shame on Toyota for not fixing this
  issue.

- **Priuschat.com – October 19, 2015 – 2015 Prius**

  I have a 2015 Prius. when I operate the ventilation system
  without using the AC, and the air on by-pass I get a rear bad
  smell. In reading other forums this appears to be a known
  issue. Has anyone found a solution through Toyota? With
  6500 mile I should not be needing to spray disinfectants etc
  into the ac system.

62.     Customer complaints posted on Priuschat.com, which according to the website, "has been the go-to spot for Prius, hybrid, and EV discussion for over 10 years," are very descriptive when identifying the nature of the foul odor in their Class Vehicles:

- ***The shame of it! Embarrassing AC odor. Kind of like a ripe sweat sock,*** when first starting up the AC or after turning the compressor off and running the fan for a while.  Any ideas? The Prius is new since mid-May with about 2200 miles on it. (April 10, 2005 – 2005 Prius)

- OK! I just bought a 2005 Prius and it smells! Before I test drove a RAV4 from 2006 and felt the same smell. Did anybody reach to a solution. And btw, I am 90% (I grew up in a farm) the ***it smells like SHEEP***. (October 1, 2009 – 2005 Prius)

- I realize there are several posts on this as I have read every thread. However, no one seems to have given a reason for what is causing the problem. I have called several Toyota dealers as well asking about it and they have no idea what I'm talking about. ***The smell is the "horse" smell others have described. I don't know if it is a horse or straw smell, but, it smells like a horse stall. The smell permeates my wife's clothes and she is not enjoying the car for this reason***. (October 15, 2010 – 2008 Prius)

- ***I have a Prius 2006 and everyone tells me that is smells like "band aids"*** - exactly as you described it. Some say it smells like a new car smell. I think it somewhat in between, but ***the band-aid smell does in fact get worse in damp or wet weather as you also described***. The interior of my car is leather. I theorized at one time that it was the "rubber" smell from the spare tire and that somehow the smell of that was making it's way into the cabin area, but I have since decided that is not the case and more than likely the seat material. As far as the other odors that people are describing (electrical wires burning or other), I do not liken this band-aid smell to that, so suspect those are other odor issues. (March 20, 2013 – 2013 Prius)

- ***The previous owner had several large dogs and they were in the car quite often. There is a very strong smell that permeates the car when I turn on the fan. It is not as strong when I only use the AC without the fan. I am just guessing***

23

> *it is related to the dogs*; I am not totally sure. Does anyone
> know how I can totally get rid of this odor? It is so strong I
> am considering not keeping the car if I cannot get rid of it.
> (June 1, 2021 – 2017 Prius)

63.     In fact, querying the word "smell" in the search function on Priuschat.com produces

dozens of threads dedicated to discussing the Defective HVAC System in the Class Vehicles, a

sample of which can be found below:

- Funky Mouldy [sic] smell from A/C vents

- Foul Smell When Air Conditioner is Turned ON

- My whole car stinks (2007)

- Musty Smell From A/C

- Rotten Egg or Natural Gas smell coming from A/C

- Do all Gen 2 cars have a mold problem?

- 2007 Prius A/C Vent Odor (smells like dirty socks)

- Mildew under rear passenger carpet

- Does your AC Smell

- Musty Smell From A/C

- Strange smell from heating

- I hate the smell of mildew in the morning ...

64.     A November 1, 2012 post by a consumer on Justanswer.com details just how foul

and disgusting the odor emanating from the Defective HVAC System can be to its occupants, as

well as Toyota's inability to properly remove the odor it causes:

> **Toyota Prius: I have an overpowering urine smell coming out…**
> *I have an overpowering urine smell coming out of my air vents.*
> *Has been for nearly a year now.* I have changed the cabin filter,
> flushed the AC system, and sprayed lysol through the intake air
> vents. The smell occurs when running the air vents with outside air

intake set to on (not when closing the air loop and recirculating air.) *Somehow an animal must have gotten into the engine, urinated and the urine and bacteria has built up somewhere in the car. It is awful and everyone that rides in my car smells it.* Yesterday I took it to a Toyota dealer and their only suggestion was replacing the heater coil and AC system at a cost of $3,000 since they think the urine and bacteria have infiltrated these systems. They said Toyota issued a new repair bulletin to replace AC systems that have tighter seals to prevent this type of problem. My car only has 50,000 miles on it and I am beyond despair with this situation since I own the car.

### iii.        *Prior Litigation Involving the Toyota Prius*

65.      Defendants also knew about the Defective HVAC System in the Class Vehicles based on *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:17-cv-00035 (C.D. Cal.), where a California plaintiff who had purchased a new 2014 Toyota Prius brought claims stemming from Toyota's failure to disclose the same Defective HVAC System at issue in this case.

66.      The plaintiff in *Stockinger* alleged that his Class Vehicle contained the Defective HVAC System, which exposes drivers and passengers to mold and other contaminants, and that as a result of the Defect, the plaintiff "had experienced incidents where he and occupants of his vehicle have been exposed to noxious and foul odors emitted from the Defective HVAC System."

67.      Testimony from that plaintiff's deposition in *Stockinger* confirms the severity of the "noxious and foul odors" alleged, describing the smell as "obnoxious," like "mold" or a "fungus smell," similar to "stagnant water" in an "old house" with "no ventilation for a long time[,]" like a "burning inspect smell"---a "very bad smell," which she added was constant and lingered for the whole ride.

68.      Publicly available internal Toyota documents filed in that case show not only that Toyota knew that its HVAC systems needed to be redesigned to fix the Defective HVAC System, even engineering small, incremental improvements, but none of these engineering changes was sufficient.  Instead, as Toyota's Cross-Car Line Manager observed, a "complete solution" to

Toyota's HVAC odor problem "would require a new design of the HVAC evaporator box for all of our vehicles."

                iv.      **_Distributor and Dealer Communications Acknowledging Customer Complaints and the Defective HVAC System_**

69.      Evidence submitted in *Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV-MORENO (S.D. Fla.), another similar litigation that involves the same Defective HVAC System, has revealed that Toyota and SET were also well aware of the Defective HVAC System in the Class Vehicles.

70.      Although Toyota had independent access to a database that housed customer complaints, including those pertaining to the Defective HVAC System in the Class Vehicles, according to publicly available documents from such litigation, SET communicated directly with Toyota's dealerships about consumer complaints and would flag to Toyota those that it felt were particularly in need of attention.  SET recognized that HVAC odor was a significant and persistent problem, and acknowledged that it "continues to receive customer complaints over this concern, an issue which has resulted in 43 buybacks over the last 10 years."

71.      SET also participated in odor investigations alongside Toyota, attending some HVAC conferences, and some SET employees shared a physical building with a Toyota Product Quality Field Office, so that, according to one Toyota employee, Toyota could work with SET on HVAC odor issues.

72.      In 2010, SET and Toyota together participated in HVAC odor testing, confirming that odor was emanating from the HVAC systems in Toyota vehicles. In 2011, SET and Toyota together implemented HVAC odor inspection protocols designed to find the source of the odor rather than simply masking it.

73.    In September of 2012, Toyota discussed the complaints that it had received from SET.  As described by Christopher Hitt, Product Engineer with TMS, "AC has been one of the top issues for SET for the last few years. SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal."

74.    The high number of complaints in the Camry that Toyota identified in 2012 led Toyota to internally describe HVAC odor as a "chronic issue" by 2012.  Indeed, according to Toyota's DQPS (Design Quality Planning system) PP100 (Problems Per 100) for 2012, in the category of AC Odor, the Camry was the worst *non-hybrid* vehicle in the Toyota car categories at 6.22%, meaning that 6.22% of Camry owners reported an issue with HVAC odor in their vehicles.

75.    According to that DPQS, however, the worst vehicle *across all of Toyota's vehicle lines* was the Prius, with a PP100 of 11.88%.  In other words, *11.88% of Prius owners reported an issue with HVAC odor in their vehicles—almost twice the number of Camry owners that reported the same issue.*

76.    Even Toyota's own employees complained of the Defective HVAC System and the odor it produces in their own vehicles.  For example, Dwayne Kinsey, a Field Product Engineer for TMS, started complaining of HVAC Odor in his 2012 Camry, and after a year of Toyota being unable to rid his vehicle of the odor, a Toyota service technician recommended replacing the evaporator core in his vehicle's HVAC system.  In fact, while Mr. Kinsey was dealing with the HVAC System Defect in his vehicle, he was proposing an agenda for speaking with various Toyota dealers regarding the HVAC odor, including meeting with SET about the impact of the Defective HVAC System on dealers' business.

77.     In addition to passing along to the customer the cost for abating the odor rather than covering it under warranty, SET and Toyota both took the position that customers should be told the HVAC odor was "normal," agreeing that because "[t]here isn't any effective repair method" the "[d]ealership just has to explain to customers that 'It is normal' and can't perform a repair of customer's vehicles about HVAC odor."

78.     SET apparently represented Toyota in Lemon Law, buyback, and other arbitration proceedings, and was consistently focused on how contextualizing the issue at the consumer level would impact SET and Toyota's position going into those proceedings. In these proceedings, SET took the position at Toyota's direction that the HVAC odor was not a repairable defect, making clear that "Toyota is trying not to set a precedence [sic]," but that regardless of the source of the odor, "it doesn't negate the fact we are aware of it, and until we find a fix, we're going to maintain the position that it's 'normal'"

79.     Technicians who deviated from the position that the odor was normal were met with sharp rebuke.  In a 2013 communication, a Toyota case manager stated that they advise customers to take several steps to remediate any HVAC odor, but that if the odor is not alleviated, "we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition."  A SET customer loyalty specialist forwarded the message to SET Customer Retention Specialist Jennifer Geiger, letting her know that she had explained "our problem with unnecessary repairs attempts" to the Toyota employee, who said she understood and would share it with the rest of her colleagues. In response, Ms. Geiger stated that the explanation was "not okay" and described it as "damaging, burying to us!!."

80.     SET at times made suggestions or considered making suggestions to Toyota regarding remediation of the odor. For example, in 2015, SET reached out to Toyota "regarding

Camry HVAC odor," prompting Toyota executives to request a study into how to improve consumer issues with HVAC odor in its vehicles. One of the suggestions was to introduce charcoal filters as original equipment with the vehicles and/or that their initial installation should be covered by warranty.

81.     Toyota already knew, however, that charcoal filters would reduce HVAC odor, but in 2013 had refused to absorb the cost in connection with the upgraded charcoal filter. Toyota was concerned not only with absorbing the original cost outright, but also the cost to replace the filter every 10,000 miles as necessary, and even the potential of shifting the cost to consumers, as this would impact third-party cost of ownership ratings and thus possibly decrease Class Vehicle sales.

82.     Gregory Lang, Toyota's Product Planning Manager at the time, also expressed his belief that HVAC odor is "[n]ot a common warranty claim as dealers typically try to avoid this as it is only a temporary fix and could then start the road towards a buy-back." Mr. Lang added: "While it is tempting to only specify the charcoal filter as a field fix for customers who complain, this causes problems to ask them to pay more for something they will believe that we should have included originally. It is more logical to equip it OE [original equipment] and then explain to customer that smell has started as it is time to replace the filter."

83.     Several Toyota employees also expressed concern about the unfair practices employed to conceal the HVAC System Defect from consumers and to pass along increased costs associated with the HVAC System Defect to consumers. For example, on September 9, 2015, Shayne Carter, a Toyota pricing manager, emailed Ethan Leighton, the National Product Planning Manager for Toyota, stating he agreed with employees from SET expressing those concerns and asked: "[I]f this is a known issue with a TSB for how to repair, why are we asking to charge

customers[;] it does seem challenging to explain why to get what a customer should expect as a standard condition for the air conditioner (no odor) we charge more?"

E.     **Marketing and Concealment**

84.     The above sources clearly evidence that Defendants have known about the Defective HVAC System since at least the late 1990s, and, without question, that the Class Vehicles contained the Defective HVAC System well before the date that Plaintiff and Class members made their Class Vehicle purchase.

85.     Notwithstanding Defendants' exclusive and superior knowledge of the Defective HVAC System, Defendants failed to disclose the HVAC System Defect to consumers, including Plaintiff and Class members, at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the same defect through the 2020 model year.

86.     Indeed, at all relevant times, in advertisements, promotional materials, and other representations, Toyota and SET continuously maintained that the Class Vehicles were safe and reliable, while uniformly omitting any reference to the HVAC System Defect. Plaintiff, directly or indirectly, viewed or heard such advertisements, promotional materials, or representations prior to purchasing or leasing his Class Vehicle.  The misleading statements and omissions about the Class Vehicles' safety and reliability in Defendants' advertisements, promotional materials, and representations were material to Plaintiff's and Class members' decision to purchase or lease the Class Vehicles.

87.     Toyota could have easily disclosed the Defective HVAC System to Plaintiff and Class members given that it engaged in national advertising campaigns for the Class Vehicles on the Internet, in print, on the radio, and on television, and Defendants distributed Class Vehicle

brochures to dealers for provision to potential customers.  Plaintiff and Class members also would have been aware of the deception had Defendants fully disclosed the nature and extent of the HVAC Defect to its dealerships and directed the dealerships to advise Plaintiff and Class members of same given that, for the most part, each Plaintiff interacted with, and received information from, sales representatives at authorized Toyota dealerships prior to purchasing their Class Vehicles. Indeed, Defendants routinely communicate with consumers through its authorized dealerships via product brochures, special service messages, TSBs, and warranty programs.

88.     In sum, Defendants had ample opportunity to disclose their omissions to Plaintiff and Class members through these channels and more, but failed to do so.

## F.     **The Damage Caused by the Defective HVAC System**

89.     Plaintiff and Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Toyota were not those for which Plaintiff and Class members bargained.  Rather, the Class Vehicles suffered from a common defect—the Defective HVAC System.  Had Plaintiff and Class members known of the Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

90.     As a result of the disparity between the quality of the Class Vehicles negotiated for and the Vehicles actually received, Plaintiff and Class members suffered economic harm.  This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that

remedy); (b) the discount that Plaintiff and Class members would have required to accept the Vehicles in their actual condition; and/or (c) the diminished value of the Vehicles.

91.     Plaintiff and Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value representations made by Defendants.  A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Defective HVAC System.  Plaintiff and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for—a high quality and durable vehicle that would retain its value under normal conditions.

92.     As a direct result of Defendants' misrepresentations and omissions, Plaintiff and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain. Plaintiff and Class members paid a premium for the Class Vehicles, which Defendants advertised as being durable and of high-quality, and received Vehicles that contained a known but concealed defect.  Toyota was unjustly enriched because it obtained and retained monies paid by Plaintiff and Class members who paid a price for the Class Vehicles that was higher than the value of the vehicles they received in return.

93.     As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and their failure to disclose the Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

G.     **Fraudulent Concealment Allegations**

94.     Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Toyota and SET responsible for disseminating false and misleading marketing materials and information regarding

the Class Vehicles.  Defendants necessarily are in possession of, or have access to, all of this information.

95.     Plaintiff's claims arise out of Defendants' fraudulent concealment of the Defect and Defendants' representations about the quality, durability, and value of the Class Vehicles.

96.     To the extent that Plaintiff's claims arise from Defendants' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases his claims.  Plaintiff alleges that at all relevant times, including specifically at the time he purchased or leased his Class Vehicle, Defendants knew, or were reckless in not knowing, of the Defective HVAC System; Defendants were under a duty to disclose the Defect based upon their exclusive knowledge of it, their affirmative representations about it, and their concealment of it, and Defendants never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

97.     Plaintiff makes the following specific fraud allegations with as much specificity as possible, although he does not have access to information necessarily available only to Defendants:

a.     *Who*:  Defendants actively concealed the Defective HVAC System from Plaintiff and Class members while simultaneously touting the quality and durability of the Class Vehicles.  Plaintiff is unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Toyota and SET responsible for such decisions.

b.     *What*:  Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Defective HVAC System.  Defendants concealed the Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles.

c.      *When*:  Defendants concealed material information regarding the Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day.  Defendants have not disclosed the truth about the Defective HVAC System in the Class Vehicles to anyone outside of Toyota or SET.  Defendants have never taken any action to inform consumers about the true nature of the Defect in Class Vehicles.  And when consumers brought their Class Vehicles to Toyota complaining of the foul odor emitting from the vehicles, Toyota denied any knowledge of, or responsibility for, the Defect, and in many instances, required consumers to pay out-of-pocket expenses to purportedly remedy the situation, when Toyota knew there was no solution for the Defect.

d.      *Where*:  Defendants concealed material information regarding the true nature of the Defective HVAC System in every communication they had with Plaintiff and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing in which Defendants disclosed the truth about the Defect in the Class Vehicles to anyone outside of Toyota or SET. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.

e.      *How*:  Defendants concealed the Defective HVAC System from Plaintiff and Class members and made representations about the quality and durability of the Class Vehicles.  Defendants actively concealed the truth about the existence and nature of the Defect from Plaintiff and Class members at all times, even though they knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendants

promised in their marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that they knew were false, misleading, and deceptive.

        f.    *Why*:   Defendants actively concealed material information about the Defective HVAC System in Class Vehicles for the purpose of inducing Plaintiff and Class members to purchase or lease the Vehicles rather than purchasing or leasing competitors' vehicles, and made representations about the quality and durability of the Vehicles.  Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications, Plaintiff (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## V.   TOYOTA ENGAGED IN MAIL AND WIRE FRAUD

98.    Toyota's illegitimate scheme to sell more Class Vehicles at inflated prices (by concealing the defect in the Class Vehicles' Defective HVAC Systems and making affirmative false representations about the quality and durability of the Class Vehicles), along with its scheme to sell additional components and services to Plaintiff and Class members to mitigate the Defect (which Defendants have to date admitted has no actual repair), constitute mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

99.    To further the scheme to defraud, Toyota repeatedly concealed the nature and scope of the Defective HVAC System. To carry out or attempt to carry out its scheme to defraud, Toyota conducted or participated in the conduct of the affairs of the Toyota RICO Enterprise through patterns of racketeering activity that employed the use of the mail/or and wire facilities, as described below.

100.    The materials prepared by Toyota for review by consumers, including owner manuals, warranty information, and maintenance schedules, failed to include any reference to the Defective HVAC System. For example, the Warranty and Maintenance Guide for the Class Vehicles included a full description of the recommended maintenance for the vehicle up to 120,000 miles of service. While an inspection of the radiator, condenser and/or intercooler is listed for every 15,000 miles of service, there is no mention of any necessary service at all for the evaporator, which is at the center of the Defective HVAC System. There also is no mention of the need to employ charcoal filters or any other specific service required for the Defective HVAC System.

101.    The same Toyota manual prominently displays Toyota's promise of quality in the Class Vehicles. "[W]e're dedicated to building products of the highest quality and reliability. . . We're confident—as you should be—that your Toyota will provide you with many years of enjoyable driving."

102.    Indeed, the Toyota owner's manuals furnished with the Class Vehicles omit information about the existence of the Defective HVAC System that can pose a health and safety hazard to vehicle occupants and can mislead consumers, including Plaintiff and Class members, into believing that any odors detected in the Class Vehicles are caused by an accumulation of odors from other unrelated sources. These manuals were drafted by the Toyota Defendants and distributed to Distributors and Dealers to give to consumers, including Plaintiff and Class members.

103.    The press releases published by Toyota for each model year of Prius Class Vehicles also fail to mention the Defective HVAC System and the health and safety hazard associated with the Defect.

104.    These public statements failed to disclose the material fact that Class Vehicles exposed consumers, including Plaintiff and Class members and their passengers, to mold and other contaminants, that the Class Vehicles contained the Defective HVAC System, or that attempts by Toyota or Dealers to mitigate the resultant HVAC odors would not be effective or covered by the warranty, or if they were covered by a warranty, that warranty coverage would eventually expire despite the fact that the defect lacked a permanent solution.

105.    These statements are fraudulent in and of themselves and are also designed to lull consumers, including Plaintiff and Class members, into believing that no fraudulent scheme is occurring and that their vehicles are not defective.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

106.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defective HVAC System and the misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the Defective HVAC System and could not reasonably discover the defect or Defendants' deception with respect to the Defect.

107.    Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained a Defective HVAC System and corresponding safety hazard.  As alleged herein, the existence of the Defective HVAC System and corresponding safety hazard were material to Plaintiff and Class members at all relevant times.  Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Defect in the Defective HVAC System.

108.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, and grade of the Class Vehicles and to disclose the Defective HVAC System and associated safety hazard.

109.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein including the Defective HVAC System and safety hazard. Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

110.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.    CLASS ALLEGATIONS

111.    Plaintiff brings this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated as members of the following Nationwide Class (under the laws of the State of Florida) and Florida Class, defined as:

> **<u>Nationwide Class:</u>**
>
> All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.  Class Vehicles consist of Toyota Priuses, model years 2006-2020.
>
> **<u>Florida Class:</u>**
>
> All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

112.    Excluded from the Class are Defendants; their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendants; Toyota Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

113.     Certification of Plaintiff's claims for Class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

114.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Fed. R. Civ. P. 23.

115.     **Numerosity.**  Rule 23(a)(1) of the Federal Rules of Civil Procedure:  The Class members are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believes that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiff but may be ascertained from Toyota's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

116.     **Commonality and Predominance.**  Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

a.     whether Defendants engaged in the conduct alleged herein;

b.     whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

c.     whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a Defective HVAC System;

d.     whether Plaintiff and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

e.      whether Defendants' alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

f.      whether Defendants have been unjustly enriched under applicable state laws;

g.      whether Toyota has violated its express warranties to Plaintiff and Class members;

h.      whether Toyota has breached implied warranties to Plaintiff and Class members;

i.      whether Defendants actively concealed the Defect in order to maximize profits to the detriment of Plaintiff and Class members;

j.      whether Toyota conspired with SET in furtherance of the unlawful acts alleged herein;

k.      whether the Toyota RICO Enterprise engaged in mail and/or wire fraud;

l.      whether the Toyota RICO Enterprise engaged in a pattern of racketeering activity;

m.      whether the scheme described among Toyota, DENSO, SET, and Dealers resulted in injury to Plaintiff's and Class members' business or property;

n.      whether the scheme described between Toyota, DENSO, SET, and Dealers is an enterprise within the meaning of 18 U.S.C. § 1961(4);

o.      whether Toyota conspired with SET and other unknown co-conspirators to violate 18 U.S.C. § 1962(c);

p.      whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

q.      such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

117. **Typicality.** Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above. All claims seek recovery on the same legal theories and are based upon Defendants' common course of conduct.

118. **Adequacy.** Rule 23(a)(4) of the Federal Rules of Civil Procedure: Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiff and his counsel.

119. **Declaratory Relief.** Rule 23(b)(2) of the Federal Rules of Civil Procedure: Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class members, thereby making declaratory relief appropriate with respect to each Class as a whole.

120. **Superiority.** Rule 23(b)(3) of the Federal Rules of Civil Procedure: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek

redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.   CAUSES OF ACTION

**A.**     **Claims Brought on Behalf of the Nationwide Class**

### COUNT I

**VIOLATION OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(c)
(Against Toyota Defendants)**

121.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

122.    The Toyota Defendants are "persons," as that term is defined in 18 U.S.C. § 1961(3).

123.    The Toyota Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity.

124.    Plaintiff and members of the Nationwide Class are "person[s] injured in his or her business or property" by reason of the Toyota Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

**The Toyota RICO Enterprise**

125.    The following persons and others presently unknown have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Toyota RICO Enterprise:

a.    The Toyota Defendants, who designed, manufactured, and sold millions of vehicles equipped with the Defective HVAC System that they knew or were reckless in not knowing contained the Defect in the Defective HVAC System, the scope and nature of which they concealed from and misrepresented to Plaintiff, Class members, the public, and regulators for more than a decade, while falsely and inaccurately representing that their vehicles were safe and reliable, thereby deceiving Plaintiff and Class members.

b.    The Toyota Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiff and Class members into purchasing, leasing, and "repairing" dangerous and defective vehicles and actively concealing the defect in the Defective HVAC System and the health and safety hazard it poses to Plaintiff and Class members.

c.    Defendant SET, who distributed Class Vehicles and Class Vehicle parts and accessories to Toyota Dealers in certain states, including Florida, performed activities associated with the advertising, marketing, and selling of the Class Vehicles, provided warranties and warranty repairs, and disseminated technical information and mechanic training materials regarding the Class Vehicles they knew or should have known contained Defective HVAC Systems.

d.    Defendant SET's Officers and Executives, who have collaborated and/or colluded with each other and with other associates-in-fact in the Toyota RICO Enterprise to

43

deceive Plaintiff and Class members into purchasing dangerous and defective vehicles and actively concealing the defect in the Defective HVAC System and the health and safety hazard it poses to Plaintiff and Class members.

e.      DENSO, who, with the Toyota Defendants' guidance and instructions, designed, manufactured, and sold millions of Defective HVAC Systems likely knowing that they contained the HVAC System Defect, the scope and nature of which it concealed from and misrepresented to the public and regulators for more than a decade.

f.      The DENSO Officers, Executives, and Engineers, who have collaborated with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiff and Class members into purchasing or leasing dangerous and defective vehicles and actively concealing the HVAC System Defect and the health and safety hazard it poses to Plaintiff and Class members.

g.      Dealers, who sold, leased, and serviced the Class Vehicles containing the Defective HVAC System in their defective condition, when they knew or should have known the Class Vehicles contained the HVAC System Defect. Dealers also misrepresented to Plaintiff and Class members that the foul, noxious, and/or toxic odors caused by the HVAC System Defect was not caused by a defect and could be remedied or repaired, when they knew or should have known these representations were false and only induced consumers to spend more money to fix a defect that had no repair.

h.      Dealers' Officers and Executives, who have collaborated with each other and with other associates-in-fact in the Toyota RICO Enterprise to deceive Plaintiff and Class members into purchasing, leasing, and "repairing" dangerous and defective vehicles and actively

concealing the HVAC System Defect and the health and safety hazard it poses to Plaintiff and Class members.

126.    The Toyota RICO Enterprise, which engaged in, and whose activities affected interstate commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), and it consists of "persons" associated together for a common purpose. The Toyota RICO Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities, and it directly engaged in the production and distribution of goods and services in interstate commerce.

127.    While the Toyota Defendants participated in the conduct of the Toyota RICO Enterprise, they each had an existence separate and distinct from the Toyota RICO Enterprise. Further, the Toyota RICO Enterprise was separate and distinct from the pattern of racketeering in which the Toyota Defendants have engaged.

128.    At all relevant times, the Toyota Defendants primarily operated, controlled, or managed the Toyota RICO Enterprise, through a variety of actions. The Toyota Defendants' participation in the Toyota RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Toyota Defendants manufactured, marketed, leased, and sold Class Vehicles with the Defective HVAC System, concealed the nature and scope of the HVAC System Defect, and profited from such concealment.

129.    The members of the Toyota RICO Enterprise all served a common purpose: to sell as many Defective HVAC Systems and Class Vehicles containing the Defective HVAC Systems, as possible, and thereby maximize the revenue and profitability of the Toyota RICO Enterprise's members. The members of the Toyota RICO Enterprise shared the profits generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the

scheme to defraud. Each member of the Toyota RICO Enterprise benefited from the common purpose: the Toyota Defendants sold or leased more Class Vehicles, and received more for those vehicles than they would have otherwise had the scope and nature of the HVAC System Defect not been concealed; DENSO sold more Defective HVAC Systems to the Toyota Defendants than they would have otherwise had the scope and nature of the HVAC System Defect not been concealed; SET distributed more Class Vehicles to Dealers; and Dealers sold, leased, and serviced more Class Vehicles, and leased or sold those vehicles at a much higher price as a result of the concealment of the scope and nature of the HVAC System Defect from Plaintiff and Class members.

### The Pattern of Racketeering Activity

130.    The Toyota Defendants each conducted and participated in the conduct of the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity that has lasted over a decade, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

131.    For both Toyota Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the HVAC System Defect found in millions of Toyota vehicles in the United States in order to sell more Class Vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with recalling vehicles suffering from the HVAC System Defect. By concealing the scope and nature of the HVAC System Defect contained in millions of vehicles, the Toyota Defendants also maintained and boosted consumer confidence in the Toyota brand, and avoided remediation costs and negative publicity, all of which furthered

the scheme to defraud and helped the Toyota Defendants sell more vehicles than they would have otherwise sold and at a much higher price or for a higher profit.

132.    As detailed in the factual allegations above, the Toyota Defendants were well aware that the HVAC System in the Class Vehicles was defective and expelled noxious, foul, and/or toxic odors that exposed Plaintiff and Class members to a health and safety hazard caused by the presence of mold and other contaminants, but intentionally subjected Plaintiff and Class members to those risks or consciously disregarded them in order to maximize their profits. Moreover, once they received several NHTSA complaints and consumer complaints, the Toyota Defendants discussed the further dangers associated with the HVAC System Defect and Toyota issued TSBs about the Defect, which they shared with SET and Dealers, but nevertheless Toyota continued to conceal the nature and scope of the HVAC System Defect from Plaintiff and Class members and continued to sell and lease or cause to sell and lease Class Vehicles to unsuspecting consumers, including Plaintiff and Class members, that contained the Defect.

133.    To also further the scheme to defraud, the Toyota Defendants promoted and touted the safety, reliability, and quality of the Class Vehicles, while simultaneously concealing the nature and scope of the HVAC System Defect.

**The Predicate Acts of Mail and Wire Fraud**

134.    To carry out or attempt to carry out the scheme to defraud, the Toyota Defendants have conducted or participated in the conduct of the affairs of the Toyota RICO Enterprise through the following pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

        a.      The Toyota Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet and transmitted or caused to be transmitted by means of mail

and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including through the Toyota website, communications with NHTSA, statements to the press, and/or communications with other members of the Toyota RICO Enterprise, as well as advertisements and other communications to Toyota customers, including Plaintiff and Class members; and

        b.      The Toyota Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein. From at least the late 1990s to the present, Toyota regularly utilized the interstate and international mail and wires to ship and pay for the Defective HVAC Systems from DENSO's offices in Michigan and California, among others located in the United States.

     135.    The Toyota Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes include but is not limited to the following:

        a.      During the relevant time period, the Toyota Defendants transmitted or caused to be transmitted (which herein after also means that the Toyota Defendants acted with knowledge that the use of the interstate or foreign mails and/or wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and/or wire communication travelling in interstate or foreign commerce, between its offices in Japan, California, Florida, and Kentucky communications concerning the defective nature of the HVAC system, recognizing that the Defective HVAC System installed in Toyota's vehicles exposed vehicle occupants to foul, noxious, and/or toxic odors, which presented a serious health and safety hazard to Class Vehicle occupants.

b.    On or about May 9, 1997, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "Air Conditioning Evaporator Odor," which described the HVAC System Defect as "[a] musty odor" that was "emitted from the air conditioning system of some vehicles." Toyota and the other members of the Toyota RICO Enterprise, however, continued to conceal the HVAC System Defect from consumers, including Plaintiff and Class members, for over a decade, despite receiving copious complaints from consumers, choosing to instead increase their profits.

c.    On or about August 6, 2009, Toyota again transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "HVAC Odor" affecting 2004-2009 Prius vehicles to address an "HVAC system odor." Toyota stated in this TSB that the issue was only covered by the Toyota Comprehensive Warranty, which expired after "36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date," which continued to falsely mislead consumers, including Plaintiff and Class members, into believing the HVAC system was neither defective nor posed a health and safety hazard to its consumers and vehicle occupants.

d.    Also in 2009, Toyota transmitted or caused to be transmitted its 2010 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

e.      In 2010, Toyota transmitted or caused to be transmitted its 2011 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

f.      On or about November 29, 2011, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a revision to its August 6, 2009 TSB, informing Dealers that a "newly designed evaporator subassembly has been made available to decrease the potential for HVAC odors," but again stating that the issue was only covered by the Toyota Comprehensive Warranty, which expired after "36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date," which continued to falsely mislead consumers, including Plaintiff and Class members, into believing the HVAC system was neither defective nor posed a health and safety hazard to its consumers and vehicle occupants.

g.      Also in 2011, Toyota transmitted or caused to be transmitted its 2012 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

h.      On or about March 14, 2012, Toyota transmitted or caused to be transmitted from its offices in Florida to its offices in Michigan by means of mail and/or wire communications travelling in interstate and/or foreign commerce an invitation to a meeting to discuss the impact of the HVAC odor in the Class Vehicles with SET and "comments by health care professionals," conceding that the fumes emitting the foul, noxious, and/or toxic odors could also have a negative health impact on vehicle occupants, yet Toyota and the other members of the Toyota RICO Enterprise never disclosed this to Plaintiff, Class members, or the public. Instead, Toyota and the other members of the Toyota RICO Enterprise concealed the HVAC System Defect to increase their profits and avoid the costs and bad publicity associated with a recall or lemon lawsuit.

i.      On or about September 19, 2012, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling in interstate and/or foreign commerce between in its offices in California to its offices in Texas, a summary of its communications with SET acknowledging that the "AC odor has been one of the top issues for SET for the last few years" but that "SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida," which "caused warranty claims and field reports to drop off," further concealing the Defect from Plaintiff and Class members.

j.      Also in 2012, Toyota transmitted or caused to be transmitted its 2013 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

k.     On or about January 23, 2013, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling from its offices in Michigan to its offices in Australia and Japan, explaining that Toyota and its Dealers are "hesitant" to attempt to repair the HVAC System Defect, because the odors come back and it would subject them to Lemon Law liability, demonstrating that the Toyota Defendants, SET, and Dealers were aware the Defective HVAC System had no permanent repair and was defective, and yet failed to inform Plaintiff, Class members, and the public of the Defect, instead choosing not to even address the problem in order to increase their profits and avoid the costs of a recall or lemon law suits.

l.     On or about July 25, 2013, Toyota transmitted or caused to be transmitted by means of mail and/or wire communications travelling in interstate and/or foreign commerce between its offices in Kansas and SET's offices in Florida standard language to be provided to Toyota customers complaining of HVAC odor, which stated that the odor was not a defect but rather "an industry-wide condition" and encouraged customers "to contact [their] local Toyota dealership for a thorough evaluation of the condition," thereby working with SET to conceal the true nature and scope of the HVAC System Defect from consumers, including Plaintiff and Class members, and to increase profits by sending consumers to Dealers where they would be charged inspection fees and "repair" charges.

m.    On or about September 12, 2013, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, a TSB titled "HVAC Odor Maintenance," which falsely described the odors as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the

Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Further, the TSB admitted that "there is no way to eliminate these odors" and the instructed general procedure "will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiff and Class members to pay for remedies that would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

n.      Also in 2013, Toyota transmitted or caused to be transmitted its 2014 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

o.      In 2014, Toyota transmitted or caused to be transmitted its 2015 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

p.      On or about April 9, 2015, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, an update to the September 12, 2013 TSB titled "HVAC Odor Maintenance," which

expanded the "condition" to cover 2015 Prius vehicles and again falsely described the odors as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Toyota also admitted that "there is no way to eliminate these odors" and the instructed general procedure "will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiff and Class members to pay for remedies that would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

q.      On September 9, 2015, by means of mail and/or wire communications travelling in interstate and/or foreign commerce Toyota transmitted or caused to be transmitted from its offices in Texas to its offices in California, an email admitting that the Class Vehicles contained a Defective HVAC System, which was an engineering problem that affected "a basic requirement of the system" that should be replaced without charge. Nevertheless, Toyota continued to conceal the Defect, charging its customers to "repair" the issue, and increasing its profits by selling more Class Vehicles, which Plaintiff and Class members would not have purchased or leased or would have paid significantly less for had they been aware of the Defect.

r.      Also in 2015, Toyota transmitted or caused to be transmitted its 2016 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul,

noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

s.     On or about November 10, 2016, Toyota transmitted or caused to be transmitted from its offices in Kansas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, an update to the September 12, 2013 TSB titled "HVAC Odor Maintenance," which expanded the "condition" to cover 2016-2017 Prius vehicles and again falsely described the odors as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Toyota also admitted that "there is no way to eliminate these odors" and the instructed general procedure "will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiff and Class members to pay for remedies that would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

t.     Also in 2016, Toyota transmitted or caused to be transmitted its 2017 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

55

u.      In 2017, Toyota transmitted or caused to be transmitted its 2018 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

v.      In 2018, Toyota transmitted or caused to be transmitted its 2019 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

w.      In 2019, Toyota transmitted or caused to be transmitted its 2020 Prius brochure by means of a wire communication travelling in interstate and/or foreign commerce to all states by posting or having the brochure posted on its website, which touted the Prius' driving experience, despite knowing these vehicles contained the HVAC System Defect that emitted foul, noxious, and/or toxic odors into the vehicle, and knowing these representations were false and likely to deceive consumers, including Plaintiff and Class members.

x.      On or about March 10, 2020, Toyota transmitted or caused to be transmitted from its offices in Texas by means of mail and/or wire communications travelling in interstate and/or foreign commerce to its Dealers located in multiple other states, including but not limited to Florida, an update to the September 12, 2013 TSB titled "HVAC Odor Maintenance," which expanded the "condition" to cover 2018-2020 Prius vehicles and again falsely described the odors

as "naturally occurring from the HVAC system and/or related environmental factors" and "a normal characteristic of automotive A/C systems," thereby directing Dealers and other members of the Toyota RICO Enterprise to conceal the true nature and scope of the HVAC System Defect. Toyota also admitted that "there is no way to eliminate these odors" and the instructed general procedure "will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors" (emphasis in original), but nevertheless, Toyota and the other members of the Toyota RICO Enterprise encouraged Plaintiff and Class members to pay for remedies that would fail to completely repair the HVAC System Defect, to increase Defendants' and other members of the Toyota RICO Enterprise's profits.

136.    The Toyota Defendants' conduct in furtherance of this scheme was intentional. Plaintiff and Class members were directly harmed as result of the Toyota Defendants' intentional conduct. Plaintiff and Class members, among others, relied on the Toyota Defendants' omissions or material misrepresentations.

137.    As described throughout this complaint, the Toyota Defendants engaged in a pattern of related and continuous predicate acts for over a decade. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiff and Class members and obtaining significant monies and revenues from them while providing Defective HVAC Systems and Class Vehicles worth significantly less than the purchase or lease price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

138.    The predicate acts all had the purpose of generating significant revenue and profits for the Toyota Defendants and the Toyota RICO Enterprise at the expense of Plaintiff and Class members. The predicate acts were committed or caused to be committed by the Toyota Defendants

through their participation in the Toyota RICO Enterprise and in furtherance of its fraudulent scheme. The predicate acts were interrelated in that they involved obtaining Plaintiff's and the Class members' funds and avoiding the expenses associated with recalling and remediating the HVAC System Defect.

## Injury to Plaintiff and the Class

139.    By reason of and as a result of the conduct of the Toyota Defendants and their pattern of racketeering activity, Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.    overpayment for leased or purchased Class Vehicles, in that Plaintiff paid for vehicles with safe and functioning HVAC systems and instead obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

b.    the value of the Class Vehicles has diminished, thus reducing their resale value.

140.    Had the Toyota Defendants been entirely forthcoming with Plaintiff, Class members, NHTSA, and the public in a timely manner about the true nature and scope of the Defective HVAC System and the risks it poses to vehicle occupants, as was their duty, Plaintiff and Class members would not have suffered these harms. The Toyota Defendants' conduct and their pattern of racketeering activity were reasonably calculated to deceive persons of ordinary prudence and comprehension and were committed with reckless indifference to the truth if not outright intent to deceive.

141.    The Toyota Defendants' violations of 18 U.S.C. § 1962(c) were committed with the specific intent to defraud, thereby entitling Plaintiff and Class members to treble damages under 18 U.S.C. § 1964(c).

142.    The Toyota Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees, pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT II

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against All Defendants)

143.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

144.    At all relevant times, the Toyota Defendants, SET, and other unknown co-conspirators were associated with the Toyota RICO Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate directly and indirectly in the conduct of the affairs of the Toyota RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). The Toyota Defendants, SET, and other unknown co-conspirators also agreed to the objective of the conspiracy or to commit at least two racketeering predicate acts.

145.    Over the course of the past decade or more, the Toyota Defendants, SET, and other unknown co-conspirators: shared information about the Defective HVAC Systems' inherent flaws, their failure to perform as required, and the foul, noxious, and/or toxic fumes and odors emitted by the Defective HVAC System into the Class Vehicles; delayed and/or prevented the release of inculpatory information or information involving the Defect; and maintained a consistent public posture as to the condition of the Defective HVAC System and the risk it posed. The Toyota Defendants', SET's, and other unknown co-conspirators' close cooperation on issues surrounding

the HVAC System Defect, their concealment of the nature and scope of the Defective HVAC System, and their joint participation in predicate acts described below is evidence of the conspiracy.

## Overt Acts

146.    Toyota committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof. More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Toyota, SET, and other unknown co-conspirators:

147.    Toyota, SET, and other unknown co-conspirators knew that the Defective HVAC System was emitting into the Class Vehicles foul, noxious, and/or toxic odors caused by mold spores.

148.    Toyota was aware of the Defective HVAC System installed in its vehicles, since at least the late 1990s, after receiving numerous customer complaints about the odors emitted into the vehicle through the Defective HVAC System, and Toyota issued several TSBs to SET and Dealers. Yet, Toyota concealed the Defect from Plaintiff and Class members, and instead falsely represented that the foul, noxious, and/or toxic odors were "natural" and normal, thereby deceiving consumers and the public.

149.    Toyota communicated to SET and Dealers again in 2011, 2013, and 2015 via TSBs regarding the Defective HVAC Systems, but Toyota misrepresented to consumers that the odor was natural and directed SET and Dealers to encourage consumers complaining about the foul, noxious, and/or toxic odors and moldy smell to bring their vehicles into Toyota Dealers, knowing there was no effective remedy for the Defect.

150.     In 2012 and 2013, Toyota engaged in several discussions with SET regarding the Defective HVAC Systems and acknowledged the safety and health hazard for passengers exposed to the mold fumes and foul, noxious, and/or toxic odors emitted by the Defective HVAC System. Nevertheless, neither Toyota nor SET nor any other members of the Toyota RICO Enterprise alerted Plaintiff, Class members, NHTSA, or the public about this health and safety hazard. Instead ,Toyota and SET conspired to conceal the nature and scope of the HVAC System Defect.

151.     In addition, SET engaged in the following predicate acts in furtherance of the conspiracy:

a.     In at least 1997, 2009, 2011, 2013, and 2015, SET and Dealers received from Toyota TSBs regarding the HVAC System Defect, but instead of disclosing the Defect to Plaintiff, Class members, and the public, SET conspired with Toyota to conceal the Defect, in order to maximize its profits and encouraged consumers complaining of the odors to go to their local Dealers to have their vehicles examined and "repaired" in order to charge customers additional labor fees and service parts, even though SET knew there was no effective repair and all remedies described in the TSBs would at best only temporarily minimize the odor.

b.     In at least 2011 and 2012, SET refused to even address customer complaints regarding the Defective HVAC System in order to avoid legal costs and liability under Florida's Lemon Law. Instead of disclosing to consumers, including Plaintiff and Class members, that the odors they complained of in their Class Vehicles were produced by a known Defect in the HVAC system, SET instead misrepresented that the condition was normal.

c.     In or about September of 2015, SET acknowledged the HVAC System Defect should be covered under the warranty because it was an engineering defect, but nevertheless

conspired with Toyota to treat the odors and fumes caused by the HVAC System Defect as a normal condition and charge consumers for ineffective "repairs."

152.    Toyota and SET's misrepresentations and acts also caused the Dealers to engage in the following predicate acts in furtherance of the Toyota RICO Enterprise:

    a.    Dealers continued to sell Class Vehicles to Class Members knowing they contained a Defective HVAC System and failed to disclose this Defect to Plaintiff and Class members.

    b.    Dealers continued to charge customers for inspections of the Defective HVAC System and repair efforts to decrease the intensity of the odors caused by the Defective HVAC System.

153.    Toyota, SET, and other unknown co-conspirators agreed to and did conduct and participate in the conduct of the Toyota RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiff and Class members, as more fully described in the prior Count and herein.

### Injury to Plaintiff and the Class

154.    As a direct result of Toyota's, SET's, and other unknown co-conspirators' conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiff and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a.    overpayment for leased or purchased Class Vehicles, in that Plaintiff and Class Members paid for vehicles with functioning HVAC systems and instead obtained vehicles with anything but, and have been deprived of the benefit of their bargain; and

    b.    the Class Vehicles' value has diminished, thus reducing their resale value.

155.     Had Toyota, SET, and other unknown co-conspirators been entirely forthcoming with Plaintiff, Class members, NHTSA, and the public in a timely manner about the true nature and scope of the Defective HVAC System and the risks it poses to vehicle occupants, as was their duty, Plaintiff and Class members would not have suffered these harms. Toyota's, SET's, and other unknown co-conspirators' conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension and was committed with reckless indifference to the truth if not outright intent to deceive.

156.     Toyota's, SET's, and other unknown co-conspirator's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiff and Class members to treble damages under 18 U.S.C. § 1964(c).

## COUNT III

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. §2301, *et seq.*
### (Against Toyota Defendants)

157.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

158.     This Court has jurisdiction to decide claims brought under the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.* ("MMWA") by virtue of 28 U.S.C. §1332(a)-(d).

159.     The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. §2301(1).

160.     Plaintiff is a "consumer" within the meaning of the MMWA, 15 U.S.C. §2301(3). He is a consumer because he is a person entitled under applicable state law to enforce against the warrantor the obligations of its written warranties.

161.    Toyota is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. §2301(4)-(5).

162.    15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

163.    In connection with the purchase or lease of all Class Vehicles, and as detailed above, Toyota provided Plaintiff and Class members with a warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, which is covered under 15 U.S.C. §2301(6).

164.    Toyota breached its warranty, as described in more detail above, and is therefore liable to Plaintiff and Class members pursuant to 15 U.S.C. §2310(d)(1).  Without limitation, the Class Vehicles share a common design and/or manufacturing defect in that the Class Vehicles are defectively designed and built with an HVAC System that fails to properly remove all humidity and water and emits foul, noxious, and/or toxic odors into the vehicles' passenger compartments when the Defective HVAC System is in use.  Toyota's refusal to fully cover repairs and acknowledge the Defect in order to inform current and future purchasers and lessors of Class Vehicles is woefully insufficient.

165.    In its capacity as a warrantor, Toyota has knowledge of the inherent Defect in the Class Vehicles.  Any effort by Toyota to limit any aspect of its warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

166.    Any limitations Toyota might seek to impose on its warranties are procedurally unconscionable.  There was unequal bargaining power between Toyota and Plaintiff and Class

members, as, at the time of purchase and lease, Plaintiff and Class members had no other options for purchasing warranty coverage other than directly from Toyota.

167.     Any limitations Toyota might seek to impose on its warranties are substantively unconscionable.  Toyota knew that the Class Vehicles were defective and would continue to pose quality concerns after the warranties purportedly expired.  Toyota failed to disclose these defects to Plaintiff and Class members.  Thus, Toyota's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

168.     Plaintiff and each of the other Class members have had sufficient direct dealings with either Toyota or its agents (Dealerships) to establish privity of contract between Toyota, on the one hand, and Plaintiff and each of the other Class members, on the other hand.  Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Toyota and its Dealers, and specifically, of Toyota's warranties.  The Dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to, benefit consumers.

169.     Pursuant to 15 U.S.C. §2310(e), Plaintiff is entitled to bring this class action and is not required to give Toyota notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Fed. R. Civ. P. 23.

170.     Plaintiff and Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them.  Because Toyota is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and Class members have not reaccepted their Class Vehicles by retaining them.

171.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25, and the amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. §2310(d)(2), Plaintiff and Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Class members in connection with the commencement and prosecution of this action.

172.    Plaintiff seeks the establishment of a Toyota-funded program for Plaintiff and Class members to recover out-of-pocket costs incurred in attempting to rectify the Defect in their Class Vehicles.

**B.    Claims Brought on Behalf of the Florida Class**

**COUNT IV**

**FRAUDULENT CONCEALMENT**
**(Against Toyota Defendants)**

173.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

174.    Plaintiff bring this claim on behalf of himself and the Florida Class under the common law of fraudulent concealment.

175.    Toyota fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles, the existence of the Defective HVAC System, and Toyota's ability to render an adequate repair for the Defect.

176.    Despite advertising the durability and quality of the Class Vehicles, Toyota knew when it manufactured, marketed, and sold or leased the Class Vehicles that HVAC System thereon suffered from a design and/or manufacturing defect that reduced the Class Vehicles' value and causes the Class Vehicles' HVAC System to emit foul, noxious, and/or toxic odors that contained mold and other contaminants.

177.    Toyota failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the Class Vehicles and Toyota knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit.  Through its active concealment and/or suppression of these material facts, Toyota sought to increase consumer confidence in the Class Vehicles, and to falsely assure purchasers and lessors of the same that the Class Vehicles were of sound quality and that Toyota was a reputable manufacturer that stands behind the automobiles it manufactures. Toyota engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

178.    Plaintiff and Class members were unaware, and could not reasonably discover on their own, that Toyota's representations were false and misleading, or that it had omitted material facts relating to the Class Vehicles.

179.    Toyota had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defect because:

a.    Toyota had exclusive or far superior knowledge of the Defect and concealment thereof;

b.      the facts regarding the Defect and concealment thereof were known and/or accessible only to Toyota;

c.      Toyota knew that Plaintiff and Class members did not know about, or could not reasonably discover, the Defect and concealment thereof; and

d.      Toyota made representations and assurances about the durability and qualities of the Class Vehicles that were misleading, deceptive, and incomplete without the disclosure of the fact that the aluminum used on the Class Vehicles suffered from a systemic design and/or manufacturing defect.

180.    These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the Class Vehicles, and because they substantially reduced the value of the Class Vehicles purchased or leased by Plaintiff and Class members.  Whether the Class Vehicles were defective, of sound quality, and durable, and whether Toyota stood behind such Class Vehicles, would have been an important factor in Plaintiff's and the Class members' decisions to purchase or lease the Class Vehicles.  Plaintiff and Class members trusted Toyota not to sell them vehicles that were defective and significantly overpriced.

181.    Toyota intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Class Vehicles were free from known defects, as represented by Toyota and reasonably expected by consumers.

182.    Plaintiff and Class members were unaware of these omitted material facts and would have paid less for the Class Vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts.  Plaintiff and Class members did not receive the benefit of their bargain due to Toyota's fraudulent concealment.  Plaintiff's and Class members' actions in purchasing the Class Vehicles were justified.  Toyota was in exclusive control

of the material facts, and such facts were not known or reasonably knowable to the public, Plaintiff, or Class members.

183.    Plaintiff and Class members relied to their detriment upon Toyota's reputation, fraudulent misrepresentations, and material omissions regarding the durability and quality of the Class Vehicles, the existence of the Defect, and Toyota's ability to render an adequate repair for the Defect.

184.    As a direct and proximate result of Toyota's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiff and Class members suffered injury. They purchased and leased Class Vehicles that had a diminished value by reason of Toyota's concealment of, and failure to disclose, the Defect.   Many Class members have also paid substantial money to (unsuccessfully) repair the Defect.

185.    Accordingly, Toyota is liable to the Nationwide Class and/or the Florida Class for their damages in an amount to be proven at trial.

186.    Toyota has still not made full and adequate disclosure and continues to defraud Plaintiff and Class members.  Toyota also continues to conceal material information regarding the Defect.

187.    Toyota's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class members' rights.  Toyota's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

### FRAUDULENT CONCEALMENT
### (Against SET)

188.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

189.    Plaintiff bring this claim on behalf of himself and the Florida Class under the common law of fraudulent concealment.

190.    As described above, SET made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective HVAC Systems contained in them.

191.    SET concealed and suppressed material facts regarding the HVAC System Defect, including the propensity of the Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and other contaminants into the passenger compartments of the Class Vehicles and the effects those odors and contaminants could have on vehicle occupants.

192.    SET took affirmative steps to ensure that its employees did not reveal the known HVAC System Defect to consumers, including but not limited to instructing its employees to tell consumers complaining of the Defective HVAC System that the condition was natural or normal and instructing Dealers to tell customers the same.

193.    Upon information and belief, SET has still not made full and adequate disclosure, continues to defraud Plaintiff and Class members, and continues to conceal material information regarding the Defective HVAC System.

194.    SET had a duty to disclose the Defective HVAC System because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and SET knew the facts were not known to or reasonably discoverable by Plaintiff and Class members;

b.      Intentionally concealed the foregoing from Plaintiff and Class members; and

c.      Made incomplete representations about the safety and reliability of the Defective HVAC Systems and Class Vehicles, while purposefully withholding material facts from Plaintiff and Class members that contradicted these representations.

195.    These omitted and concealed facts were material because they would be relied upon by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff and the Class.

196.    Plaintiff and Class members trusted SET not to direct them to Dealers that would sell or lease them vehicles that were defective or recommend them to pay money for inspections and repairs that were caused by a defect and that would not remedy the Defect.

197.    SET concealed and suppressed these material facts to ensure more Class Vehicles were distributed, sold, and leased to protect its profits.

198.    SET also misrepresented the safety and reliability of the Defective HVAC System and Class Vehicles, because it either (a) knew but did not disclose the HVAC System Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

199.    SET actively concealed or suppressed these material facts, in whole or in part to maintain a market for the Class Vehicles it distributed, to protect its profits, and to avoid recalls that would hurt the Toyota brand it distributed and cost SET profits. SET did so at the expense of Plaintiff and the Florida Class.  Plaintiff and the Florida Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

200.    Had they been aware of the Defective HVAC Systems installed in the Class Vehicles, Plaintiff and the Florida Class would either not have paid as much for their Class Vehicles or would not have purchased or leased them at all. Plaintiff and the Florida Class did not receive the benefit of their bargains as a result of SET's fraudulent concealment and misrepresentations.

201.    Because of SET's concealment and misrepresentations, Plaintiff and the Florida Class sustained damages because they own vehicles that diminished in value as a result of SET's concealment of and failure to timely disclose the Defective HVAC System in the Class Vehicles and serious health, safety, and quality issues posed by the Defect.

202.    The value of all Florida Class members' Class Vehicles has diminished as a result of SET's fraudulent concealment and misrepresentations of the Defective HVAC System because it has made any reasonable consumer reluctant to purchase any Class Vehicle, let alone pay what otherwise would have been a fair market value for the Class Vehicles.

203.    Accordingly, SET is liable to Plaintiff and the Florida Class for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase or lease, the diminished value of the Defective HVAC System and the Class Vehicles, and/or costs incurred in storing, maintaining, or otherwise disposing of the Defective HVAC System or Class Vehicle.

204.    SET's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard for Plaintiff's and the Florida Class's rights and well-being, and with the aim of enriching SET by increasing its profits and not damaging its business with Toyota.

205.    SET's conduct, exhibiting its complete disregard for the health and well-being of consumers, including Plaintiff and Class members, warrants an assessment of punitive damages in

an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT VI

### UNJUST ENRICHMENT
### (Against Toyota Defendants)

206.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

207.   Plaintiff brings this cause of action on behalf of himself and the Florida Class under the common law of unjust enrichment.

208.   Plaintiff brings this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiff prevails on his claims that any contract with Toyota (including any express warranty) was fraudulently induced and/or Plaintiff prevails in proving that the warranties cannot be enforced by Toyota due to Toyota having provided the warranties only after entering into a contract with a purchaser or lessor, or due to Toyota's intentional and deceptive efforts to conceal the Defect and avoid its warranty obligations.

209.   Toyota has received millions in revenue from the sale of the Class Vehicles since 2004 and continues to receive millions in revenue from the sale of the Class Vehicles to this day.

210.   This revenue was a benefit conferred upon Toyota by Plaintiff and Class members, individuals living across the United States.

211.   Toyota manufactured, marketed, and sold defective Class Vehicles to Plaintiff and Class members while actively concealing the Class Vehicles' known defects and touting the durability and quality of the Class Vehicles.

212.    Toyota benefitted from selling defective vehicles for more money than they were worth, at a profit, and Plaintiff and Class members have overpaid for the vehicles and, in some instances, been forced to pay to (unsuccessfully) repair the Defect.

213.    Plaintiff and Class members elected to purchase or lease the Class Vehicles based on Toyota's misrepresentations, deception, and omissions.  Toyota knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiff and Class members when it elected to purchase or lease the Class Vehicles.

214.    The Class Vehicles' defect, and Toyota's concealment of the same, enriched Toyota beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues since 2006.

215.    Therefore, because Toyota will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiff and each Class member are entitled to recover the amount by which Toyota was unjustly enriched at their expense.

216.    Accordingly, Plaintiff, on behalf of himself and each Class member, seeks damages against Toyota in the amount by which it has been unjustly enriched at Plaintiff's and each Class member's expense, and such other relief as this Court deems just and proper.

## COUNT VII

### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### FLA. STAT. §501.201, *et seq.*
### (Against All Defendants)

217.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

218.    Plaintiff brings this claim on behalf of himself and the Florida Class.

219.    Plaintiff is a "consumer" within the meaning of FDUPTA, § 501.203(7), Fla. Stat.

220.    Defendants engaged in "trade or commerce" within the meaning of FDUPTA, § 501.203(8), Fla. Stat.

221.    FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat. Defendants participated in unfair and deceptive practices that violated FDUTPA as described above.

222.    Defendants impliedly warranted that the Class Vehicles were in merchantable condition, fit for the ordinary purpose for which vehicles are used, and were of a standard, quality, or grade that the vehicles were not.

223.    Defendants breached these warranties by misrepresenting the quality, or grade of the Class Vehicles and failing to disclose and fraudulently concealing the existence of the Defective HVAC System. Without limitation, the Class Vehicles share a common Defect in design, material, manufacturing, or workmanship that fails to operate as represented by Defendants and presents an undisclosed health and safety hazard to Plaintiff, the Florida Class, and all vehicle occupants.

224.    Any attempt by Defendants to disclaim or limit their implied warranties is unconscionable and unenforceable. Specifically, the Toyota Defendants' warranty limitations are unenforceable because they knowingly sold or leased a defective product without informing consumers, including Plaintiff and Florida Class members, about the Defect.

225.    In the course of their business, Defendants failed to disclose and actively concealed the Defective HVAC Systems contained in the Class Vehicles and the dangers and hazard posed by the Class Vehicles and the Defective HVAC Systems as described above, and otherwise engaged in activities with a tendency or capacity to deceive.

226.    In violation of FDUTPA, Defendants employed unfair and deceptive acts or practices, fraud, false pretenses, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale and/or lease of Class Vehicles. Defendants knowingly concealed, suppressed, and omitted material facts regarding the Defective HVAC System and associated health and safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff and the Florida Class.

227.    Defendants actively suppressed the fact that the Defective HVAC System in Class Vehicles is defective and presents a health and safety hazard because of materials, workmanship, design, and/or manufacturing defects. Further, Defendants employed unfair and deceptive trade practices to deny repair or replacement of the Defective HVAC System within a reasonable time in violation of FDUTPA. Defendants also breached their warranties as alleged above in violation of FDUTPA.

228.    As alleged above, Defendants have known of the Defect contained in the Class Vehicles HVAC System for over a decade. Prior to installing the Defective HVAC Systems in the Class Vehicles, Toyota knew or should have known they emitted foul, noxious, and/or toxic odors that contained mold and other contaminants, which posed a health and safety hazard to vehicle occupants, because they had received numerous consumer complaints about the foul, noxious, and/or toxic odors and had drafted or sent TSBs explaining the HVAC System Defect. SET also should have known of the Defect from discussions with Toyota and after receiving numerous complaints about the Defect from consumers and Dealers. Defendants, nevertheless, failed to disclose and actively concealed the dangers and hazard posed by the Class Vehicles and the Defective HVAC Systems installed in them.

229.    By failing to disclose and by actively concealing the HVAC System Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as a reputable manufacturer or distributor for a reputable manufacture that values safety, Defendants engaged in unfair or deceptive business practices in violation of FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective HVAC System to emit foul, noxious, and/or toxic odors and mold and pose a health and safety hazard to vehicle occupants, to ensure that consumers, including Plaintiff and Florida Class members, would purchase or lease the Class Vehicles and spend money on useless remedies and repairs.

230.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Defective HVAC System. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective HVAC Systems installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer or a reputable distributor for a reputable manufacturer that values safety.

231.    Defendants' unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Plaintiff and the Florida Class had no reasonable way to know that the Class Vehicles contained Defective HVAC Systems, which were defective in materials, workmanship, design and/or manufacture and posed a serious and significant health and safety hazard. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defective HVAC System and its associated health and safety hazard, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiff and members of the Florida Class did.

232. Defendants intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Vehicles and the Defective HVAC Systems installed in Class Vehicles with an intent to mislead Plaintiff and the Florida Class.

233. Defendants knew or should have known that their conduct violated FDUTPA.

234. Defendants made material statements and/or omissions about the safety and reliability of the Class Vehicles and/or the Defective HVAC Systems installed in them that were either false or misleading. Defendants' misrepresentations, omissions, statements, and commentary have included selling and marketing Class Vehicles as safe and reliable, despite their knowledge of the Defective HVAC System.

235. To protect their profits, avoid remediation costs and public relation problems, and increase their profits by having consumers pay for component parts and other useless repairs to remedy the HVAC System Defect, Defendants concealed the defective nature and the health and safety hazard posed by the Class Vehicles and the Defective HVAC Systems installed in them. Defendants allowed unsuspecting new and used car purchasers and lessees to continue to buy or lease the Class Vehicles and continue to drive them, despite the health and safety hazard they pose to vehicle occupants.

236. Defendants owed Plaintiff and the Florida Class a duty to disclose the true safety and reliability of the Class Vehicles and the Defective HVAC System installed in them because Defendants:

a. Possessed exclusive knowledge of the Defect and its associated health and safety hazard;

b. Intentionally concealed the foregoing from Plaintiff and the Florida Class; and/or

78

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff and the Florida Class that contradicted these representations.

237.    Because Defendants fraudulently concealed the HVAC System Defect in the Class Vehicles and the Defective HVAC Systems installed in them, resulting in a raft of negative publicity once the HVAC System Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, the Class Vehicles are now worth significantly less than they otherwise would be.

238.    Defendants' failure to disclose and active concealment of the foul, noxious, and/or toxic odors produced by the Defective HVAC Systems installed in the Class Vehicles were material to Plaintiff and the Florida Class. A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

239.    Plaintiff and the Florida Class suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information. Had Plaintiff and the Florida Class members been aware of the Defective HVAC Systems that existed in the Class Vehicles and Defendants' complete disregard for the health and safety of their consumers, including Plaintiff, Class members, and vehicle occupants, Plaintiff and the Florida Class either would not have paid as much for their Class Vehicles or would not have purchased or leased them at all. Plaintiff and the Florida Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

240.    Plaintiff and the Florida Class risk loss of use of their Class Vehicles and health issues as a result of Defendants' act and omissions in violation of FDUTPA, and these violations

present a continuing risk to Plaintiff and the Florida Class, and the public in general. Defendants' unlawful acts and practices complained of above affect the public interest.

241.    As a direct and proximate result of Defendants' violations of FDUTPA, Plaintiff and the Florida Class have suffered injury-in-fact and/or actual damage.

242.    Plaintiff and the Florida Class are entitled to recover their actual damages, under FLA. STAT. §501.211(2), and attorneys' fees under FLA. STAT. §501.2105(1).

243.    Plaintiff and the Florida Class also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under FDUTPA.

<u>COUNT VIII</u>

**BREACH OF IMPLIED WARRANTIES**
**FLA. STAT. §§672.314 AND 680.212**
**(Against Toyota Defendants)**

244.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

245.    Plaintiff brings this claim on behalf of himself and the Florida Class.

246.    Toyota is and was at all relevant times a "merchant" with respect to the Class Vehicles under FLA. STAT. §§672.104(1) and 680.1031(3)(k), and a "seller" of the Class Vehicles under §672.103(1)(d).

247.    With respect to leases, Toyota is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. §680.1031(1)(p).

248.    The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§672.105(1) and 680.1031(1)(h).

249.    A warranty that the Class Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to FLA. STAT. §672.314.

250.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and not fit for their ordinary purpose as a result of their inherent defects, as detailed above.  In addition, because any warranty repairs or replacements offered by Toyota cannot cure the Defect in the Class Vehicles, they fail to cure Toyota's breach of implied warranties.

251.    As a direct and proximate result of Toyota's breach of its implied warranties, Plaintiff and the Florida Class members have been damaged in an amount to be determined at trial.

252.    Toyota was provided notice of the issues raised in this Count and this Complaint, as detailed above.

**COUNT IX**

**BREACH OF EXPRESS WARRANTY**
**FLA. STAT. §§672.313 AND 680.21**
**(Against Toyota Defendants)**

253.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

254.    Plaintiff brings this claim on behalf of himself and the Florida Class.

255.    Toyota is and was at all relevant times a "merchant" with respect to the Class Vehicles under FLA. STAT. §§672.104(1) and 680.1031(3)(k), and a "seller" of the Class Vehicles under §672.103(1)(d).

256.    With respect to leases, Toyota is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. §680.1031(1)(p).

257.    The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§672.105(1) and 680.1031(1)(h).

258.    In connection with the purchase or lease of all Class Vehicles, Toyota provided Plaintiff and Florida Class members with a written warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, as detailed above.  In addition, Toyota's various oral and written representations regarding the standard, quality, and/or grade of the Class Vehicles constituted express warranties to Plaintiff and Florida Class members.

259.    Toyota's warranties formed a basis of the bargain that was reached when Plaintiff and Florida Class members purchased or leased their Class Vehicles.

260.    Toyota breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and Florida Class members with Class Vehicles containing Defects that were never disclosed to Plaintiff and Florida Class members; (b) failing to repair or replace the defective Class Vehicles at no cost within the applicable warranty period; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Toyota.

261.    Plaintiff and Florida Class members have given Toyota a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by Toyota can neither cure the Defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

262.    Thus, Toyota's three-year or 36,000-mile written warranty fails of its essential purpose and the recovery of Florida Class members is not limited to its remedies.

263.    Accordingly, Plaintiff and Florida Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Florida Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

264.    As a direct and proximate result of Toyota's breach of its express warranty, Plaintiff and the Florida Class members have been damaged in an amount to be determined at trial.

265.    Toyota was provided notice of the issues raised in this Count and this Complaint, as detailed above.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Nationwide and Florida Class, respectfully requests that the Court certify the proposed Nationwide and Florida Class, including designating the named Plaintiff as representative of the Nationwide Class and the Florida Class and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiff's favor and against Defendants including the following relief:

(i)    A declaration that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

(ii)    Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iii)    Punitive and exemplary damages under applicable law;

(iv)    Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by a Plaintiff or Class member to remedy the Defective HVAC System;

(v)      A determination that Defendants are financially responsible for all Class notices and the administration of Class relief;

(vi)     Any applicable statutory or civil penalties;

(vii)    An order requiring Defendants to pay both pre-judgment and post-judgment interest on any amounts awarded;

(viii)   An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(ix)     Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(x)      Any such other and further relief the Court deems just and equitable.

## X.      DEMAND FOR JURY TRIAL

Plaintiff and Class members hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.


Dated: October 12, 2021              Respectfully submitted,

                                     **KOPELOWITZ OSTROW**
                                     **FERGUSON WEISELBERG GILBERT**


                              **By:**   _/s/ Jason H. Alperstein_____
                                     Jason H. Alperstein (FBN 64205)
                                     alperstein@kolawyers.com
                                     Jeff Ostrow (FBN 121452)
                                     ostrow@kolawyers.com
                                     Kristen Lake Cardoso (FBN 44401)
                                     cardoso@kolawyers.com
                                     One West Las Olas, Suite 500
                                     Fort Lauderdale, FL 33301
                                     Telephone: (954) 525-4100
                                     Facsimile: (954) 525-4300

**GORDON & PARTNERS, P.A.**
Steven G. Calamusa (FBN 992534)
scalamusa@fortheinjured.com
Rachel A. Bentley (FBN 106870)
rbentley@fortheinjured.com
Geoffrey Stahl (FBN 89240)
gstahl@fortheinjured.com
4114 Northlake Boulevard
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050

**EDELSBERG LAW, P.A.**
Scott Edelsberg (FBN 100537)
scott@edelsberglaw.com
20900 NE 30th Ave., #417
Aventura, FL 33180
Telephone: (786) 289-9471

*Attorneys for Plaintiff and the Putative Classes*