## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 21-CV-62117-RNS

| | |
|---|---|
| JOSE JAVIER PEREZ, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., and SOUTHEAST TOYOTA DISTRIBUTORS, LLC, | ) ) ) ) ) |
| Defendants. | ) ) |

CLASS ACTION

**JURY TRIAL DEMANDED**

### AMENDED CLASS ACTION COMPLAINT

Plaintiff, Jose Javier Perez ("Plaintiff"), on behalf of himself and all other similarly situated members of the below-defined Class he seeks to represent (the "Class"), brings this action against Defendants, Toyota Motor Corporation ("TMC") and Toyota Motor Sales, U.S.A., Inc. ("TMS") (collectively, "Toyota" or "Toyota Defendants") and Southeast Toyota Distributors, LLC ("SET") (together with Toyota, the "Defendants"), upon personal knowledge as to the factual allegations pertaining to himself and as to all other matters upon information and belief, based upon the investigation of the undersigned attorneys, as follows:

### I.    INTRODUCTION

1.      Plaintiff brings his claims individually and on behalf of all persons or entities in Florida who purchased or leased a 2006-2020 Toyota Prius, 2017-2020 Toyota Prius Prime, 2010-2015 Toyota PHV, 2012-2016 Toyota Prius C, and 2012-2017 Prius V (the "Class Vehicles" or

"Vehicles"), all of which were delivered by Toyota with an identical and inherent defect in the Vehicle's Heating, Ventilation, and Air Conditioning System (the "Defective HVAC System").

2.      The defect, which was latent, but existed at the time that the Class Vehicles left Defendants' possession and control, permits the accumulation of moisture and microbial growth within the HVAC system, causing it to emit foul and noxious/toxic-smelling odors, mold, and other contaminants into the Vehicle's passenger compartments (the "HVAC Defect" or "Defect").

3.      One unsuspecting Prius owner described the odor as "an overpowering urine smell coming out of [his] vents," posting that "somehow an animal must have gotten into the engine, urinated and the urine and bacteria has built up somewhere in the car," exclaiming that "[it] is awful and that everyone [who] rides in my car smells it." Others describe the odor as smelling like a "pile of rank, sweaty socks." Many Prius owners have even expressed their concern that the HVAC Defect presents a health/safety risk to their vehicles' occupants, noting physical symptoms that manifest when the foul and noxious/toxic-smelling odors are pervasive and continuing.

4.      It is, therefore, no surprise that the HVAC Defect has resulted in numerous complaints to the National Highway Transportation Safety Administration ("NHTSA"), Toyota distributors, and Toyota dealerships across the country, as well as directly to Defendants themselves. Toyota has issued numerous Technical Service Bulletins ("TSBs") to its exclusive network of distributors and dealerships describing the foul odors being emitted from the Defective HVAC Systems. Notably, the Defective HVAC System is collaborated on by suppliers, distributors (like SET) ("Distributors"), Toyota dealerships, and other independent dealerships ("Dealers") to conceal the Defective HVAC System, while passing on to consumers, including Plaintiff and Class members, the costs to inspect, diagnose, and/or ameliorate the resultant foul odors.

5.     Toyota and SET have long been aware of the HVAC Defect but have concealed the Defect from Plaintiff, Class members, and the public. For example, based on the research and technical knowledge of Toyota Motor Engineering & Manufacturing North America, Inc. (the automobile engineering, manufacturing, research, and design concern in North America for Toyota motor vehicles), TMS published—and TMC approved—a course manual on air conditioning and climate control, in which the Toyota Defendants admitted that Toyota HVAC system odors are "a common complaint among users" and that the odors are caused by, *inter alia*, "[m]icrobes [*i.e.*, mold] growing on the evaporator surface" including "small living bacteria . . . carried into the evaporator case [that] grow in the warm, moist environment." SET also communicated with Toyota on multiple occasions regarding customer complaints as to the foul and noxious/toxic-smelling odors from the Defective HVAC System. Thus, consumers, including Plaintiff and Class members, were sold Class Vehicles that Defendants knew would accumulate mold and/or emit such odors through the Vehicles' passenger compartment.

6.     Despite its issuance of several TSBs to its exclusive network of Distributors and Dealers, Toyota and SET, kept known information of the HVAC Defect from consumers, including Plaintiff and Class members. Toyota and SET also represented the Class Vehicles as standard in quality and/or grade when they were not, and knowingly, actively, and affirmatively omitted and concealed the known existence of the Defective HVAC System to increase their profits by selling additional Vehicles and, subsequently, charging consumers for special filters, HVAC servicing, and other "repair" fees when consumers complained of the foul and noxious/toxic-smelling odors.

7.     Knowledge and information regarding the Defective HVAC System was in the exclusive and superior possession of Toyota, Distributors, including SET, and Dealers, and was

not provided to Plaintiff and Class members, who could not reasonably discover the Defect through due diligence. Based on, amongst other things, consumer complaints to Toyota, Distributors, Dealers, and NHTSA, Defendants were aware of the Defective HVAC System but fraudulently failed to disclose such information about the Defect to Plaintiff and Class members.

8.     Notwithstanding this knowledge, TMS continued selling Class Vehicles with the Defective HVAC System, TMC continued to direct and/or approve of continued production and sales of the defective Vehicles, SET continued to distribute Class Vehicles to Dealers, and Dealers continued to sell Class Vehicles with the Defective HVAC System to consumers, including Plaintiff and Class members. Indeed, Toyota and SET concealed the knowledge of this Defect and failed to disclose the existence of the Defective HVAC System to Plaintiff and Class members. Additionally, Toyota has refused to issue a recall and has not remedied the Defect and/or compensated Plaintiff or Class members for their damages resulting from the material Defect. Rather, Defendants wrongfully and intentionally concealed information about the Defective HVAC System from Plaintiff and Class members.

9.     No reasonable consumer expects to purchase or lease a vehicle that contains a Defective HVAC System that emits foul and noxious/toxic-smelling odors, mold, and other contaminants into the vehicle's passenger compartment.  The Defect is material to Plaintiff and Class members.  When Plaintiff and Class members purchased or leased their Class Vehicles, they reasonably expected that the Class Vehicles would be free from a defect in the HVAC System (or otherwise) that would not emit foul and noxious/toxic-smelling odors into the Class Vehicles' passenger compartments.

10.     Had Defendants disclosed that the HVAC system in the Class Vehicles was defective and would emit foul and noxious/toxic-smelling odors into the Vehicles' passenger

compartment, Plaintiff and Class members would not have purchased or leased their Vehicles or would have paid significantly less for their Vehicles.

11.     As a result of the Defective HVAC System and Defendants' concealment thereof, Plaintiff and Class members overpaid for their Class Vehicles, did not receive the benefit of their bargains, were exposed to foul and noxious/toxic-smelling odors while driving their Vehicles, and were forced to incur additional expenses in an attempt to remedy the Defective HVAC System in their Class Vehicles.

12.     To the extent Defendants have offered or provided odor mitigation to the Class Vehicles pursuant to the TSBs or otherwise, those mitigation attempts have not provided permanent repairs, and the Vehicle's HVAC system remains defective.  Toyota has long acknowledged this fact, and continue to advise Dealers in the most recent TSB it issued in March 2020: "NOTE[:] The procedure in this bulletin will NOT eliminate the odors described but is provided to help reduce intensity of the odors."

13.     Plaintiff and Class members therefore assert claims for violation of the Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §501.201, *et seq*., and for breaches of Toyota's express and implied warranties in connection with the sale of their Class Vehicles.

14.     As a direct result of Defendants' wrongful conduct, Plaintiff and Class members have been harmed and have suffered actual damages, including overpayment for their Class Vehicle, loss of use of their Class Vehicle, costs, and lost time associated with the diagnosis, repair, and replacement of Class Vehicle components, and the actual costs of diagnosis, repair, and replacement components to address or repair the Defective HVAC System.

## II.    JURISDICTION AND VENUE

15.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000, exclusive of costs and interest.  This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. §1367 and diversity jurisdiction under the Class Action Fairness Act ("CAFA").

16.    Venue properly lies in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(a), (b) and (c) because: a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; Defendants conduct a substantial amount of business in this District; and, at all relevant times, SET was headquartered in this District. Accordingly, Defendants have sufficient contacts with this District to subject Defendants to personal jurisdiction in this District, and venue is proper.

## III.    PARTIES

**A.    <u>Plaintiff</u>**

17.    Plaintiff is a citizen of Florida, residing in Winter Garden, Florida.  Plaintiff purchased a new 2020 Toyota Prius Prime on August 5, 2019, at Central Florida Toyota-Scion (the "Dealership"), an authorized Toyota dealer in Orange County, Florida.  Plaintiff purchased his Class Vehicle for personal, family, or household purposes, and continues to own the Vehicle.

18.    Prior to purchasing the Class Vehicle, Plaintiff reasonably expected that the Class Vehicles would be free from defects and would not emit foul and noxious/toxic-smelling odors into the Class Vehicles' passenger compartments, and Defendants did not convey—whether in Toyota's marketing commercials, through its sales representatives, or within any warranty

information provided by the sales representative—anything to the contrary with regard to Plaintiff's purchase of his Class Vehicle.

19.     Within a week of purchasing his Class Vehicle, Plaintiff began noticing a foul odor emanating from the air-conditioning ("A/C") vents of the Class Vehicle.  At first, Plaintiff thought it was just a weird "new car smell" that would dissipate over the next couple of weeks. The foul odor did not dissipate, however, and instead, the odor emanating from the Class Vehicle's A/C vents became moist and increasingly more-foul as the Summer approached.

20.     Indeed, Plaintiff recalls that a few months after purchasing his Class Vehicle, his son, who suffers from asthma and is sensitive to noxious smells, began complaining of a foul odor emanating from the A/C vents of the Class Vehicle, while riding in the Vehicle's passenger seat. At first, Plaintiff surmised the smell was from his son's shoes, but over time, Plaintiff began to observe a "humid" smell emanating from the A/C vents of the Class Vehicle that, over the Summer, increasingly smelled like wet socks.

21.     Plaintiff, did not suspect that the foul odor was being caused by a Defective HVAC System; he thought that he or other occupants of the Class Vehicle had maybe caused the smell by, for example, leaving food in the Vehicle.  Although the smell diminished after Plaintiff thoroughly cleaned his Class Vehicle, the smell returned in full force and continued to persist. Given that Plaintiff did not know at the time that the foul odor was a result of a known defect (, he believed his only solution to reduce the odor was to drive his Class Vehicle with the windows down, wash and vacuum his Vehicle every few days, and constantly use cleaning products and other odor reducers, which he had to purchase.

22.     The foul odors described above have continued to emanate from the Defective HVAC System on a periodic basis since Plaintiff purchased his Class Vehicle, and those odors continue to emanate from his Vehicle's A/C vents to this day.

23.     Defendants failed to disclose the Defective HVAC System to Plaintiff before he purchased his Class Vehicle, despite their knowledge of the Defect, and Plaintiff, therefore, purchased his vehicle on the reasonable, but mistaken, belief that it would be a high quality and durable vehicle that would retain its value.  Plaintiff would not have purchased the Class Vehicle, or would not have paid as much for it, had he known of the Defective HVAC System and its emission of foul and noxious/toxic-smelling odors or mold.

24.     Given the Defect, Plaintiff has been exposed to foul and noxious/toxic-smelling odors emitted from the Defective HVAC System in his vehicle when using or turning off the air conditioner.  Since the Dealership is unable to remedy the problem in his Class Vehicle, Plaintiff has been left without recourse and continues to experience the odors emanating from the Defective HVAC System when operating his Vehicle.

25.     Plaintiff has suffered a concrete and ascertainable loss as a direct and proximate result of Defendants' misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, the value of his Class Vehicle has been diminished as a result of the Defective HVAC System, and he has had to pay out-of-pocket expenses to remedy the Defect (which have not resolved the issue).

26.     Neither Toyota nor any of their agents, Distributors (including SET), Dealers, or other representatives informed Plaintiff and Class members of the HVAC Defect prior to Plaintiff's and the Class members' purchase or lease of the Class Vehicles.

27.     When Plaintiff and Class members purchased or leased their Class Vehicles, they relied on the reasonable expectation that the Class Vehicles would be equipped with an HVAC system that was free from material defects.  Had Defendants disclosed that the Defective HVAC System in the Class Vehicles could lead to the emission of foul and noxious/toxic-smelling odors and air filled with mold and other contaminants into the passenger compartment, Plaintiff and Class members would not have purchased or leased their Class Vehicles or would have paid significantly less for their respective vehicles.

28.     Plaintiff and Class members operated their Class Vehicles in a reasonably foreseeable manner and as the Class Vehicles were intended to be used.  Plaintiff and Class members have suffered an ascertainable loss as a result of Defendants' unfair and deceptive conduct and breaches of express and implied warranties associated with the Defective HVAC System, including but not limited to, out-of-pocket losses and diminished value of their Vehicles.

**B.    <u>Defendants</u>**

29.     TMC is the world's largest automaker and largest seller of automobiles in the United States.  TMC is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.  TMC is the parent company of TMS and conducts business in this District.

30.     TMS is a California corporation with its principal place of business in Plano, Texas.  TMS is responsible for the manufacture, distribution, and sale of all Toyota vehicles in the United States.

31.     TMC and TMS developed and disseminated the owner's manuals, warranty booklets, maintenance schedules, advertisements, and other promotional and technical materials relating to the Class Vehicles to Toyota Distributors (including SET) and Dealers, which were then disseminated to Plaintiff and Class members.

32.      SET is a Florida limited liability company with its headquarters located at 100 Jim Moran Boulevard, Deerfield Beach, Florida 33442.

33.      SET distributes Toyota vehicles, parts, and accessories to Dealers located in Florida, Georgia, Alabama, North Carolina, and South Carolina. SET is the largest independent distributor of Toyotas in the United States. Vehicles manufactured by Toyota in North America and Japan are processed at SET's facilities in Jacksonville, Florida. SET also supports Dealers through regional sales and marketing, customer service, accessory development, and sales. In 2016, SET was number two in total dealer profits for Toyota vehicles and number one in the region in Toyota Certified Used Vehicle sales. SET is also the leading distributor of Toyota parts and accessories in the United States. Finally, SET hosts one of the largest automotive training and technical support facilities for Toyota Dealers in its region, and SET provides close to 100,000 hours of training on maintenance education and diagnostic assistance and advice to Toyota Dealers, including training and assistance on Toyota's Defective HVAC System. SET acted through its authorized agents and representatives in its Dealer network while performing activities associated with advertising, marketing, and selling Class Vehicles and providing warranties, warranty repairs, and dissemination of technical information and mechanic training materials.

34.      At all times relevant to this action, Defendants distributed, sold, leased, and/or warranted the Class Vehicles under the Toyota brand name throughout the state of Florida.

## IV.    FACTUAL ALLEGATIONS

### A.    The Defective HVAC System

35.      A basic air conditioning system, such as the HVAC system in the Class Vehicles, contains components to push refrigerants through a closed system to extract heat out of the vehicle

interior and transfer that heat to the outside air during which process the refrigerant changes from a liquid to a gas and then back to a liquid.

36.     As shown in the image below, the HVAC system has a high-pressure side (shown in red), which includes the compressor, condenser and the receiver/drier, and a low-pressure side (shown in blue), which includes the expansion valve and the evaporator.  The expansion valve controls the flow and pressure of liquid refrigerant into the evaporator, and a blower draws air through the evaporator to cool and dehumidify the interior air.  As cold refrigerant passes through into the evaporator, it absorbs heat from the air and produces condensation, which is intended to drain from the HVAC system through a rubber hose onto the ground.



37.     However, the Defective HVAC System in the Class Vehicles fails to adequately remove or drain the condensed water from the evaporator and surrounding enclosure, trapping the water in the Defective HVAC System.  The resultant moisture creates an environment susceptible to the growth of mold and other contaminants and leads to the development of foul and

noxious/toxic-smelling odor, which is emitted into the passenger compartment of the Class Vehicles by the blower (together with mold and other contaminants).

38.     According to the WHO's Guidelines for Indoor Air Quality: Dampness and Mold, "[m]icrobial pollution involves hundreds of species of bacteria and fungi that grow indoors when sufficient moisture is available" and "[e]xposure to microbial contaminants is clinically associated with respiratory symptoms, allergies, asthma and immunological reactions." The Institute of Medicine has also found sufficient evidence to link indoor exposure to mold: with upper respiratory tract symptoms, coughing, and wheezing in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition. Other studies have shown a potential link between mold exposure and the development of asthma in children.

39.     No reasonable consumer expects to purchase or lease a vehicle with a Defective HVAC System that exposes them to foul and noxious/toxic-smelling odors, mold, and other contaminants.  Further, Plaintiff and Class members did not reasonably expect Toyota and its Distributors (including SET) to conceal the Defect in the Class Vehicles.  Plaintiff and Class members had no reasonable way to know that Class Vehicles contained Defective HVAC Systems, which were defective in materials, workmanship, design, and/or manufacture.

40.     As a result of Defendants' omissions and concealment, including their intentional and knowing failure to disclose that the Class Vehicles contain an HVAC Defect, Plaintiff and Class members paid more for their Class Vehicles than they would have and suffered other actual damages, including but not limited to, out-of-pocket expenses, diminished value of their vehicles, and exposure to foul and noxious/toxic-smelling odors, mold, and other contaminants.

B.      **Defendants' Knowledge of the Defective HVAC System**

41.      Defendants fraudulently, intentionally, negligently, and/or recklessly omitted and concealed from Plaintiff and Class members the Defect in the Class Vehicles even though Defendants knew of the Defective HVAC System in the Class Vehicles.

42.      Knowledge and information regarding the Defective HVAC System were in the exclusive and superior possession of Toyota, its Distributors (including SET), and Dealers, but that information was not provided to Plaintiff and Class members.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Toyota and its exclusive Dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to NHTSA, and testing performed in response to consumer complaints, *inter alia*, Defendants were aware of the Defective HVAC System in the Class Vehicles, but concealed the Defect from Plaintiff and Class members.

43.      Defendants omitted and concealed from Plaintiff and Class members the HVAC Defect in the Class Vehicles, even though Defendants knew or should have known of the design and/or manufacturing defects in the Class Vehicles.

44.      Defendants knew that the Defective HVAC System was material to owners and lessees of the Class Vehicles and neither known nor reasonably discoverable by Plaintiff and Class members before they purchased or leased Class Vehicles or within the applicable warranty periods.

45.      Notwithstanding Defendants' exclusive and superior knowledge of the Defective HVAC System, Defendants failed to disclose to and intentionally concealed the Defect from consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continue to sell Class Vehicles containing the Defect.

#### i.      *TSBs Identifying the Defective HVAC System*

46.     The potential for HVAC odor has long been a known issue to Defendants even outside the context of the Class Vehicles at issue here.

47.     As early as 1997, Toyota issued a TSB AC002-97, titled "Air Conditioning Evaporator Odor," that explicitly acknowledged the presence of microbial growth in the HVAC evaporator caused by dampness in the housing, describing the result as a "musty odor ... emitted from the air conditioning system of some vehicles which are usually operated in areas with high temperature and humidity." This TSB noted that the odor could result from "[b]lockage of the evaporator housing drainpipe, resulting in the buildup of condensate" or "[m]icrobial growth in the evaporator, arising from dampness in the evaporator housing where the cooling air flow is dehumidified."

48.     On or around August 6, 2009, Toyota issued T-SB-0261-09, titled HVAC Odor, which specifically related to HVAC odors for 2004-2008 model year Prius and 2007-2010 model year Camry vehicles.  The TSB stated: "Some Camry, Camry HV, and Prius models may exhibit an intermittent HVAC system odor.  A newly designed evaporator sub-assembly has been made available to decrease the potential for HVAC odor."  T-SB-0261-09 further stated that "[t]his repair is covered under the Toyota Comprehensive Warranty… in effect for 36 months or 36,000 miles, whichever occurs first, from the vehicle's in-service date."

49.     On or around November 29, 2011, Toyota issued a revision to the August 6, 2009, T-SB-0261-09 Rev1, updating production change information and again informing dealers that a newly designed evaporator sub-assembly had been made available to decrease the potential for HVAC odor.  The revised TSB again stated that "[t]his repair is covered under the Toyota Comprehensive Warranty…in effect for 36 months or 36,000 miles, whichever occurs first, from

the vehicle's in-service date."  It also noted, however, that "[w]arranty application is limited to occurrence of the specified condition described in this bulletin.

50.    On or around September 12, 2013, Toyota issued T-SB-0142-13, titled HVAC Odor Maintenance, which explicitly informed its dealers that the HVAC odors were normal, "naturally occurring from the HVAC system and/or related environmental factors."  In addition, the TSB, which identified the Defective HVAC System in Prius and Camry vehicles through model year 2014, explicitly informed dealers that "*there is no way to eliminate these odors*" and instructed them to "follow the General Procedure in this bulletin to minimize the odors experienced."  To ensure that its dealers where abundantly clear on this point, Toyota stated above the first step of the "General Procedure" dealers were to follow:

> **NOTE**
>
> **This procedure will NOT eliminate the odors experienced, but it's provided to help reduce the intensity of these odors.**

51.    Toyota updated T-SB-0142-13 on April 9, 2015 to include model year 2015 Prius and Camry vehicles and, again, on November 10, 2016, to include model years 2016-2017 of those vehicles.  Although Toyota updated the November 10, 2016 TSB on or around February 6, 2020, to exclude 2016 and 2017 model year Prius vehicles; on or around March 10, 2020, Toyota issued T-SB-0022-20, also titled "HVAC Odor Maintenance," which not only included those model year vehicles, but also added model year 2018-2020 Prius vehicles.

52.    Like the prior TSBs on this issue, it states that HVAC System odors are "naturally occurring" and advises Distributors and Dealers to "[f]ollow the General Procedure in this bulletin to minimize the odors experienced."  The TSB also includes detailed steps for Distributors and Dealers to follow regarding the A/C Evaporator Cleaning Procedure With Toyota Genuine A/C

Refresher Kit, which are also included in a Tech Tip issued by Toyota on October 15, 2019 (T-TT-0577-19).

53.     While Dealers and Distributors, including SET, received copies of the above-described TSBs, Plaintiff and Class members never received copies of or the information contained in the TSBs described above. Upon information and belief, the TSBs were not directly communicated to consumers, including Plaintiff and Class members. Thus, despite Defendants' knowledge of the HVAC Defect, which Defendants recognized was present in Class Vehicles, Defendants failed to disclose the Defect to owners and lessees of the Class Vehicles, including Plaintiff and Class members, and instead, intentionally concealed the HVAC Defect. Moreover, Defendants failed to provide an effective remedy for or replacement of the Defective HVAC System.

### ii.     *Customer Complaints Identifying the Defective HVAC System*

54.     Toyota knew about the Defective HVAC System in the Class Vehicles based on the voluminous complaints consumers filed with NHTSA and elsewhere.

55.     Consumers who purchased or leased Class Vehicles have filed numerous complaints with NHTSA that identify the Defective HVAC System and detail their experience with the symptoms it causes.

56.     Federal law requires Toyota to monitor defects which can cause a safety issue and report them within five (5) days. Toyota regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided additional knowledge of the Defect through these complaints. Toyota also had knowledge of the Defect in the Class Vehicles through complaints made by owners and lessees of other Toyota vehicles, including the Toyota Camry, which contains the same Defective HVAC System.

57.     Attached hereto as Composite Exhibit "A" are excerpts of: (1) a small sample of consumer complaints made to NHTSA regarding the Defective HVAC System; (2) complaints about the Defective HVAC System made on various Internet forums; and, (3) customer complaints posted on Priuschat.com, which according to the website "has been the go-to spot for Prius, hybrid, and EV discussion for over 10 years."

58.     In fact, querying the word "smell" in the search function on Priuschat.com produces dozens of threads dedicated to discussing the Defective HVAC System in the Class Vehicles, a sample of which can be found below:

- Funky Mouldy [sic] smell from A/C vents

- Foul Smell When Air Conditioner is Turned ON

- My whole car stinks (2007)

- Musty Smell From A/C

- Rotten Egg or Natural Gas smell coming from A/C

- Do all Gen 2 cars have a mold problem?

- 2007 Prius A/C Vent Odor (smells like dirty socks)

- Mildew under rear passenger carpet

- Does your AC Smell

- Musty Smell From A/C

- Strange smell from heating

- I hate the smell of mildew in the morning ...

59.     A November 1, 2012 post by a consumer on Justanswer.com details just how foul and disgusting the odor emanating from the Defective HVAC System can be to its occupants, as well as Toyota's inability to properly remove the odor it causes:

**Toyota Prius: I have an overpowering urine smell coming out…
*I have an overpowering urine smell coming out of my air vents.
Has been for nearly a year now.* I have changed the cabin filter,
flushed the AC system, and sprayed lysol through the intake air
vents. The smell occurs when running the air vents with outside air
intake set to on (not when closing the air loop and recirculating air.)
*Somehow an animal must have gotten into the engine, urinated
and the urine and bacteria has built up somewhere in the car. It is
awful and everyone that rides in my car smells it.* Yesterday I took
it to a Toyota dealer and their only suggestion was replacing the
heater coil and AC system at a cost of $3,000 since they think the
urine and bacteria have infiltrated these systems. They said Toyota
issued a new repair bulletin to replace AC systems that have tighter
seals to prevent this type of problem. My car only has 50,000 miles
on it and I am beyond despair with this situation since I own the car.**

### iii.     *Prior Litigation Involving the Toyota Prius*

60.     Defendants also knew about the Defective HVAC System in the Class Vehicles

based on *Stockinger v. Toyota Motor Sales, U.S.A., Inc.*, No. 2:17-cv-00035 (C.D. Cal.), where a

California plaintiff who had purchased a new 2014 Toyota Prius brought claims stemming from

Toyota's failure to disclose the same Defective HVAC System at issue in this case.

61.     The plaintiff in *Stockinger* alleged that his Class Vehicle contained the Defective

HVAC System, which exposes drivers and passengers to mold and other contaminants, and that

as a result of the Defect, the plaintiff "had experienced incidents where he and occupants of his

vehicle have been exposed to noxious and foul odors emitted from the Defective HVAC System."

62.     Testimony from that plaintiff's deposition in *Stockinger* confirms the severity of

the "noxious and foul odors" alleged, describing the smell as "obnoxious," like "mold" or a

"fungus smell," similar to "stagnant water" in an "old house" with "no ventilation for a long

time[,]" like a "burning inspect smell"---a "very bad smell," which she added was constant and

lingered for the whole ride.

63.     Publicly available internal Toyota documents filed in that case show not only that Toyota knew that its HVAC systems needed to be redesigned to fix the Defective HVAC System, even engineering small, incremental improvements, but that none of these engineering changes were sufficient.  Instead, as Toyota's Cross-Car Line Manager observed, a "complete solution" to Toyota's HVAC odor problem "would require a new design of the HVAC evaporator box for all of our vehicles."

       *iv.*     ***Distributor and Dealer Communications Acknowledging Customer Complaints and the Defective HVAC System***

64.     Evidence submitted in *Cardenas v. Toyota Motor Corp.*, No. 18-22798-CIV-MORENO (S.D. Fla.), another similar litigation that involves the same Defective HVAC System, has revealed that Toyota and SET were also well aware of the Defective HVAC System in the Class Vehicles.

65.     Although Toyota had independent access to a database that housed customer complaints, including those pertaining to the Defective HVAC System in the Class Vehicles, according to publicly available documents from such litigation, SET communicated directly with Toyota's dealerships about consumer complaints and would flag to Toyota those that it felt were particularly in need of attention.  SET recognized that HVAC odor was a significant and persistent problem, and acknowledged that it "continues to receive customer complaints over this concern, an issue which has resulted in 43 buybacks over the last 10 years."

66.     SET also participated in odor investigations alongside Toyota, attending some HVAC conferences, and some SET employees shared a physical building with a Toyota Product Quality Field Office, so that, according to one Toyota employee, Toyota could work with SET on HVAC odor issues.

67.     In 2010, SET and Toyota together participated in HVAC odor testing, confirming that odor was emanating from the HVAC systems in Toyota vehicles. In 2011, SET and Toyota together implemented HVAC odor inspection protocols designed to find the source of the odor rather than simply masking it.

68.     In September of 2012, Toyota discussed the complaints that it had received from SET. As described by Christopher Hitt, Product Engineer with TMS, "AC has been one of the top issues for SET for the last few years. SET stopped attempting to repair vehicles with AC odor, because of the severity of the Lemon Law in the state of Florida. SET started to tell customers the condition was normal."

69.     The high number of complaints in the Camry that Toyota identified in 2012 led Toyota to internally describe HVAC odor as a "chronic issue" by 2012. According to Toyota's DQPS (Design Quality Planning system) PP100 (Problems Per 100) for 2012, in the category of AC Odor, the Camry was the worst ***non-hybrid*** vehicle in the Toyota car categories at 6.22%, meaning that 6.22% of Camry owners reported an issue with HVAC odor in their vehicles.

70.     According to that DPQS, however, the worst vehicle ***across all of Toyota's vehicle lines*** was the Prius, with a PP100 of 11.88%. In other words, ***11.88% of Prius owners reported an issue with HVAC odor in their vehicles—almost twice the number of Camry owners that reported the same issue.***

71.     Even Toyota's own employees complained of the Defective HVAC System and the odor it produces in their own vehicles. For example, Dwayne Kinsey, a Field Product Engineer for TMS, started complaining of HVAC Odor in his 2012 Camry, and after a year of Toyota being unable to rid his vehicle of the odor, a Toyota service technician recommended replacing the evaporator core in his vehicle's HVAC system. In fact, while Mr. Kinsey was dealing with the

HVAC Defect in his vehicle, he was proposing an agenda for speaking with various Toyota dealers regarding the HVAC odor, including meeting with SET about the impact of the Defective HVAC System on dealers' business.

72.    In addition to passing along to the customer the cost for abating the odor rather than covering it under warranty, SET and Toyota both took the position that customers should be told the HVAC odor was "normal," agreeing that because "[t]here isn't any effective repair method" the "[d]ealership just has to explain to customers that 'It is normal' and can't perform a repair of customer's vehicles about HVAC odor."

73.    SET apparently represented Toyota in Lemon Law, buyback, and other arbitration proceedings, and was consistently focused on how contextualizing the issue at the consumer level would impact SET and Toyota's position going into those proceedings. In these proceedings, SET took the position at Toyota's direction that the HVAC odor was not a repairable defect, making clear that "Toyota is trying not to set a precedence [sic]," but that regardless of the source of the odor, "it doesn't negate the fact we are aware of it, and until we find a fix, we're going to maintain the position that it's 'normal.'"

74.    Technicians who deviated from the position that the odor was normal were met with sharp rebuke.  In a 2013 communication, a Toyota case manager stated that they advise customers to take several steps to remediate any HVAC odor, but that if the odor is not alleviated, "we encourage you to contact your local Toyota dealership for a thorough evaluation of the condition."  A SET customer loyalty specialist forwarded the message to SET Customer Retention Specialist Jennifer Geiger, letting her know that she had explained "our problem with unnecessary repairs attempts" to the Toyota employee, who said she understood and would share it with the

rest of her colleagues. In response, Ms. Geiger stated that the explanation was "not okay" and described it as "damaging, burying to us!!"

75.     At times, SET made suggestions or considered making suggestions to Toyota regarding remediation of the odor. For example, in 2015, SET reached out to Toyota "regarding Camry HVAC odor," prompting Toyota executives to request a study into how to improve consumer issues with HVAC odor in its vehicles.  One of the suggestions was to introduce charcoal filters as original equipment with the vehicles and/or that their initial installation should be covered by warranty.

76.     Toyota already knew, however, that charcoal filters would reduce HVAC odor, and in 2013, it had refused to absorb the cost connected with the upgraded charcoal filter.  Toyota was concerned not only with absorbing the original cost outright, but it was also concerned with the cost to replace the filter every 10,000 miles as necessary, which, if absorbed by the consumer, would impact third-party cost of ownership ratings and, thus, possibly decrease Class Vehicle sales.

77.     Gregory Lang, Toyota's Product Planning Manager, at the time, also expressed his belief that HVAC odor is "[n]ot a common warranty claim as dealers typically try to avoid this as it is only a temporary fix and could then start the road towards a buy-back."  Mr. Lang added: "While it is tempting to only specify the charcoal filter as a field fix for customers who complain, this causes problems to ask them to pay more for something they will believe that we should have included originally.  It is more logical to equip it OE [original equipment] and then explain to customer that smell has started as it is time to replace the filter."

78.     Several Toyota employees also expressed concern about the unfair practices employed to conceal the HVAC Defect from consumers and to pass along increased costs

associated with the HVAC Defect to consumers.  For example, on September 9, 2015, Shayne Carter, a Toyota pricing manager, emailed Ethan Leighton, the National Product Planning Manager for Toyota, stating he agreed with employees from SET expressing those concerns and asked: "[I]f this is a known issue with a TSB for how to repair, why are we asking to charge customers[;] it does seem challenging to explain why to get what a customer should expect as a standard condition for the air conditioner (no odor) we charge more?"

C.    **Marketing and Concealment**

79.    The above sources clearly evidence that Defendants have known about the Defective HVAC System since at least the late 1990s, and, without question, that the Class Vehicles contained the Defective HVAC System well before the date that Plaintiff and Class members made their Class Vehicle purchase.

80.    Notwithstanding Defendants' exclusive and superior knowledge of the Defective HVAC System, Defendants failed to disclose the HVAC Defect to consumers, including Plaintiff and Class members, at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles containing the same defect through the 2020 model year.

81.    Indeed, at all relevant times, in advertisements, promotional materials, and other representations, Toyota and SET continuously maintained that the Class Vehicles were safe and reliable, while uniformly omitting any reference to the HVAC Defect. Plaintiff, directly or indirectly, viewed or heard such advertisements, promotional materials, or representations prior to purchasing or leasing his Class Vehicle, but had no way of knowing what Toyota and SET knew.

82.    For example, the Warranty and Maintenance Guide for the Class Vehicles included a full description of the recommended maintenance for the vehicle up to 120,000 miles of service. While an inspection of the radiator, condenser and/or intercooler is listed for every 15,000 miles

23

of service, there is no mention of any necessary service at all for the evaporator, which is at the center of the Defective HVAC System. There also is no mention of the need to employ charcoal filters or any other specific service required for the Defective HVAC System.

83.     The same Toyota manual prominently displays Toyota's promise of quality in the Class Vehicles. "[W]e're dedicated to building products of the highest quality and reliability. . . We're confident—as you should be—that your Toyota will provide you with many years of enjoyable driving."

84.     The press releases published by Toyota for each model year of Prius Class Vehicles also fail to mention the Defective HVAC System that was equipped in each Vehicle.

85.     These public statements failed to disclose the material fact that Class Vehicles exposed consumers, including Plaintiff and Class members and their passengers, to mold and other contaminants, that the Class Vehicles contained the Defective HVAC System, or that attempts by Toyota or Dealers to mitigate the resultant HVAC odors would not be effective or covered by the warranty, or if they were covered by a warranty, that warranty coverage would eventually expire despite the fact that the defect lacked a permanent solution.

86.     As reasonable consumers, the concealed statements and omissions about the Class Vehicles' safety and reliability in Defendants' advertisements, promotional materials, and representations were material to Plaintiff's and Class members' decision to purchase or lease the Class Vehicles.

87.     Toyota could have easily disclosed the Defective HVAC System to Plaintiff and Class members given that it engaged in national advertising campaigns for the Class Vehicles on the Internet, in print, on the radio, and on television, and Defendants distributed Class Vehicle brochures to dealers for provision to potential customers.  Plaintiff and Class members may have

also been aware of the deception had Defendants fully disclosed the nature and extent of the HVAC Defect to its dealerships and directed the dealerships to advise Plaintiff and Class members of such information.  Indeed, Defendants routinely communicate with consumers through its authorized dealerships via product brochures, special service messages, TSBs, and warranty programs.

88.    In sum, Defendants had ample opportunity to disclose their omissions to Plaintiff and Class members through these channels and more, but failed to do so.

**D.**    **The Damage Caused by the Defective HVAC System**

89.    Plaintiff and Class members purchased or leased the Class Vehicles based on their reasonable but mistaken belief that their Vehicles were of high quality, durable, and free of defects. However, the Class Vehicles delivered by Toyota were not those for which Plaintiff and Class members bargained.  Rather, the Class Vehicles suffered from a common defect—the Defective HVAC System.  Had Plaintiff and Class members known of the Defect, they would have either: (a) paid substantially less for the Class Vehicles; (b) required an immediate remedy that restored the Class Vehicles to the conditions bargained for; or (c) not purchased or leased the Class Vehicles.

90.    As a result of the disparity between the quality of the Class Vehicles negotiated for and the Vehicles actually received, Plaintiff and Class members suffered economic harm.  This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiff and Class members would have required to accept the Vehicles in their actual condition; and/or (c) the diminished value of the Vehicles.

91.    Acting as reasonable consumers, Plaintiff and Class members paid premiums to purchase and lease the Class Vehicles as a result of the brand, quality, durability, and value

representations made by Defendants. A vehicle purchased or leased with the reasonable expectation that it is of high quality and durable as advertised is worth more than a vehicle known to be subject to the problems or risks associated with the Defective HVAC System.  Plaintiff and Class members were harmed from the day they drove their Class Vehicles off the lot because they did not get what they paid for—a high quality and durable vehicle that would retain its value under normal conditions.

92.     As a direct result of Defendants' concealment and omissions, Plaintiff and Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  Plaintiff and Class members paid a premium for the Class Vehicles, which Defendants advertised as being durable and of high-quality, but received Vehicles that contained a known but concealed defect.

93.     As a result of Defendants' unfair, deceptive, and/or fraudulent business practices, and their failure to disclose the Defect and the problems associated therewith, owners and lessees of the Class Vehicles have suffered losses in money and/or property.

**E.     Fraudulent Concealment Allegations**

94.     Absent discovery, Plaintiff is unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Toyota and SET responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. However, Defendants necessarily are in possession of, or have access to, all of this information.

95.     Plaintiff's claims arise out of Defendants' concealment of the Defect and Defendants' representations about the quality, durability, and value of the Class Vehicles.

96.     To the extent that Plaintiff's claims arise from Defendants' fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiff bases

his claims.  Plaintiff alleges that at all relevant times, including specifically at the time he purchased his Class Vehicle, Defendants knew of the Defective HVAC System, but never disclosed the Defect to Plaintiff or the public at any time or place or in any manner.

97.     Plaintiff makes the following fraud allegations with as much specificity as possible, although he does not have access to information necessarily available only to Defendants:

a.     *Who*:  Defendants actively concealed the Defective HVAC System from Plaintiff and Class members while simultaneously touting the quality and durability of the Class Vehicles. Plaintiff is unaware of, and is therefore unable to identify, the true names and identities of those specific individuals at Toyota and SET responsible for such decisions.

b.     *What*:  Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Defective HVAC System. Defendants concealed the Defect and made contrary representations about the quality and durability, and other attributes of the Class Vehicles.

c.     *When*:  Defendants concealed material information regarding the Defect at all times and made representations about the quality and durability of the Class Vehicles, starting no later than 2004, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day. Defendants have not disclosed the truth about the Defective HVAC System in the Class Vehicles to anyone outside of Toyota or SET.  Defendants have never taken any action to inform consumers about the true nature of the Defect in Class Vehicles.  And when consumers brought their Class Vehicles to Toyota complaining of the foul odor emitting from the vehicles, Toyota denied any knowledge of, or responsibility for, the Defect, and in many instances, required

consumers to pay out-of-pocket expenses to purportedly remedy the situation, when Toyota knew there was no solution for the Defect.

d.      *Where*:   Defendants concealed material information regarding the true nature of the Defective HVAC System in every communication they had with Plaintiff and Class members and made contrary representations about the quality and durability of the Class Vehicles. Plaintiff is aware of no document, communication, or other place or thing in which Defendants disclosed the truth about the Defect in the Class Vehicles to anyone outside of Toyota or SET. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.

e.      *How*:   Defendants concealed the Defective HVAC System from Plaintiff and Class members and made representations about the quality and durability of the Class Vehicles that were not true.   Indeed, Defendants actively concealed the truth about the existence and nature of the Defect from Plaintiff and Class members at all times, even though they knew about the Defect and knew that information about the Defect would be important to a reasonable consumer, and Defendants promised in their marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that they knew were false, misleading, and deceptive.

f.      *Why*:   Defendants actively concealed material information about the Defective HVAC System in Class Vehicles for the purpose of inducing Plaintiff and Class members to purchase or lease the Vehicles rather than purchasing or leasing competitors' vehicles, and made representations about the quality and durability of the Vehicles.   Had Defendants disclosed the truth, for example, in their advertisements or other materials or communications,

Plaintiff (and reasonable consumers) would have been aware of it, and would not have bought the Class Vehicles or would have paid less for them.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS

98.   Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defective HVAC System and the misrepresentations and omissions alleged herein.  Through no fault or lack of diligence, Plaintiff and Class members were deceived regarding the Defective HVAC System and could not reasonably discover the defect or Defendants' deception with respect to the Defect.

99.   Plaintiff and Class members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained a Defective HVAC System.  As alleged herein, the existence of the Defect was  material to Plaintiff and Class members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Defect in the Defective HVAC System.

100.   In fact, in other litigation, such as the cases discussed *supra*, Defendants vehemently denied that the subject HVAC System was defective, instead maintaining that those plaintiffs' claims were without merit.

101.   Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including the Defective HVAC System. Plaintiff and Class members, acting as reasonable consumers, reasonably relied on Defendants' knowing, active, and affirmative concealment and omissions.

102.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VI.     CLASS ALLEGATIONS

103.     Plaintiff brings this action pursuant to Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated as members of the following Class (under the laws of the State of Florida), defined as:

> All persons or entities that purchased or leased a Class Vehicle within Florida or that purchased or leased a Class Vehicle and reside in Florida.

104.     Excluded from the Class are Defendants; their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendants; Toyota Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

105.     Certification of Plaintiff's claims for Class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

106.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Fed. R. Civ. P. 23.

107.     **Numerosity.**  Rule 23(a)(1) of the Federal Rules of Civil Procedure:  The Class members are so numerous and geographically dispersed that individual joinder of all Class members is impracticable.  While Plaintiff is informed and believes that there are at least thousands of Class members, the precise number of Class members is unknown to Plaintiff but may be ascertained from Toyota's books and records.  Class members may be notified of the pendency of

this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

108.    **Commonality and Predominance.** Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to:

a.    whether Defendants engaged in the conduct alleged herein;

b.    whether Defendants designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in Florida;

c.    whether Defendants designed, manufactured, marketed, and distributed Class Vehicles with a Defective HVAC System;

d.    whether Plaintiff and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

e.    whether Defendants' alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of Florida's state consumer fraud statute;

f.    whether Toyota has violated its express warranties to Plaintiff and Class members;

g.    whether Toyota has breached implied warranties to Plaintiff and Class members;

h.    whether Defendants actively concealed the Defect in order to maximize profits to the detriment of Plaintiff and Class members;

        i.     whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted; and

        j.     such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

109.   **Typicality.**  Rule 23(a)(3) of the Federal Rules of Civil Procedure:  Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon Defendants' common course of conduct.

110.   **Adequacy.**  Rule 23(a)(4) of the Federal Rules of Civil Procedure:  Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  The Class' interests will be fairly and adequately protected by Plaintiff and his counsel.

111.   **Declaratory Relief.**  Rule 23(b)(2) of the Federal Rules of Civil Procedure: Defendants have acted or refused to act on grounds generally applicable to Plaintiff and Class members, thereby making declaratory relief appropriate with respect to each Class as a whole.

112.   **Superiority.**  Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek

redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.   CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
#### (FLA. STAT. §§ 501.201, *et seq.*)

113.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

114.   Plaintiff brings this claim on behalf of himself and the Class against all Defendants.

115.   Plaintiff and the members of the Class are "consumer[s]" within the meaning of FDUPTA, FLA. STAT. § 501.203(7), and as such are entitled to the protections of FDUPTA.

116.   Defendants engaged in "trade or commerce" within the meaning of FDUPTA, FLA. STAT. § 501.203(8), and are therefore subject to the provisions contained in FLA. STAT. §§ 501.201, *et seq.*

117.   In selling automobiles in Florida, Defendants were required to be honest in its dealings and not engage in any actions that had the effect of deceiving purchasers or lessees of the Class Vehicles.

118.   By reason of the conduct alleged herein, Defendants engaged in unfair and deceptive business practices in violation of FDUTPA, FLA. STAT. §§ 501.201, *et seq.* Specifically,

Defendants violated FDUTPA by providing and marketing materially false information about the Class Vehicles, including the 2020 Prius, as being in merchantable condition, fit for the ordinary purpose for which vehicles are used, and of a standard, quality, or grade, although Toyota knew that, due to the Defective HVAC Systems, the Class Vehicles emitted foul and noxious/toxic-smelling odors, mold, and other contaminants into the Vehicle's passenger compartments.

119.   As a result of Defendants' violations of FDUTPA, Plaintiff and the members of the Class (having acted as reasonable consumers) have suffered a substantial injury, have been aggrieved, and are, thus, entitled to damages under FDUTPA.

120.   As redress for Defendants' repeated violations of FDUTPA, Plaintiff and the members of the Class are entitled to, *inter alia*, damages and declaratory relief.

121.   Plaintiff and the Class are entitled to:

a.   Recover their actual damages, pursuant to FLA. STAT. § 501.211(2);

b.   A declaratory judgment to the effect that Defendants have engaged in unfair, unconscionable, and deceptive business practices in violation of FDUTPA as set forth in FLA. STAT. § 501.211(1); and

c.   Attorneys' fees under FLA. STAT. § 501.211 and/or FLA. STAT. § 501.2105(1).

## COUNT II

### BREACH OF IMPLIED WARRANTIES
### (FLA. STAT. §§ 672.314 AND 680.212)

122.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

123.   Plaintiff brings this claim on behalf of himself and the Class against the Toyota Defendants.

124.    Toyota is and was at all relevant times a "merchant" with respect to the Class Vehicles under FLA. STAT. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of the Class Vehicles under § 672.103(1)(d).

125.    With respect to leases, Toyota is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. § 680.1031(1)(p).

126.    The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§ 672.105(1) and 680.1031(1)(h).

127.    A warranty that the Class Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to FLA. STAT. § 672.314.

128.    The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and not fit for their ordinary purpose as a result of their inherent defects, as detailed herein.  In addition, because any warranty repairs or replacements offered by Toyota cannot and do not cure the Defect in the Class Vehicles, they fail to cure Toyota's breach of implied warranties.

129.    As a direct and proximate result of Toyota's breach of its implied warranties, Plaintiff and the Class members have been damaged in an amount to be determined at trial.

130.    Toyota was provided notice of the issues raised in this Count, as detailed above.

## COUNT III

### BREACH OF EXPRESS WARRANTY
### (FLA. STAT. §§ 672.313 AND 680.21)

131.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

132.    Toyota is and was at all relevant times a "merchant" with respect to the Class Vehicles under FLA. STAT. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of the Class Vehicles under §672.103(1)(d).

133.    With respect to leases, Toyota is and was at all relevant times a "lessor" of motor vehicles under FLA. STAT. § 680.1031(1)(p).

134.    The Class Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. §§ 672.105(1) and 680.1031(1)(h).

135.    In connection with the purchase or lease of all Class Vehicles, Toyota provided Plaintiff and Class members with a written warranty covering defects in materials and workmanship of the Class Vehicles for three years or 36,000 miles, as detailed above.  In addition, Toyota's various oral and written representations regarding the standard, quality, and/or grade of the Class Vehicles constituted express warranties to Plaintiff and Class members.

136.    Toyota's warranties formed a basis of the bargain that was reached when Plaintiff and Class members purchased or leased their Class Vehicles.

137.    Toyota breached its express warranties (including the implied covenant of good faith and fair dealing) by: (a) knowingly providing Plaintiff and Class members with Class Vehicles containing Defects that were never disclosed to Plaintiff and Class members; (b) failing to repair or replace the defective Class Vehicles at no cost within the applicable warranty period; (c) ignoring, delaying responses to, and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to the representations made by Toyota.

138.    Plaintiff and Class members have given Toyota a reasonable opportunity to cure its breaches of express warranty or, alternatively, were not required to do so because such an opportunity would be unnecessary and futile given that the repairs or replacements offered by

Toyota can neither cure the Defect in the Class Vehicles nor resolve the incidental and consequential damages flowing therefrom.

139. Thus, Toyota's three-year or 36,000-mile written warranty fails of its essential purpose and the recovery of Class members is not limited to its remedies.

140. Accordingly, Plaintiff and Class members assert as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and Class members of the purchase or lease price of all Class Vehicles currently owned and leased, and for such other incidental and consequential damages as allowed.

141. As a direct and proximate result of Toyota's breach of its express warranty, Plaintiff and the Class members have been damaged in an amount to be determined at trial.

142. Toyota was provided notice of the issues raised in this Count and this Complaint, as detailed above.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests that the Court certify the proposed Class, including designating the named Plaintiff as representative of the Class and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Federal Rule of Civil Procedure 23, and that the Court enter judgment in Plaintiff's favor and against Defendants including the following relief:

(i) A declaration that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

(ii)      Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

(iii)     Punitive and exemplary damages under applicable law;

(iv)      Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by Plaintiff or Class members to remedy the Defective HVAC System;

(v)       A determination that Defendants are financially responsible for all Class notices and the administration of Class relief;

(vi)      Any applicable statutory or civil penalties;

(vii)     An order requiring Defendants to pay both pre-judgment and post-judgment interest on any amounts awarded;

(viii)    An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

(ix)      Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

(x)       Any such other and further relief the Court deems just and equitable.

## X.      DEMAND FOR JURY TRIAL

Plaintiff and Class members hereby demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.


Dated: January 3, 2022                          Respectfully submitted,

                                                **KOPELOWITZ OSTROW
                                                FERGUSON WEISELBERG GILBERT**


                                                **By:** __/s/ Jason H. Alperstein_____
                                                Jason H. Alperstein (FBN 64205)

alperstein@kolawyers.com
Jeff Ostrow (FBN 121452)
ostrow@kolawyers.com
Kristen Lake Cardoso (FBN 44401)
cardoso@kolawyers.com
One West Las Olas, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300

**GORDON & PARTNERS, P.A.**
Steven G. Calamusa (FBN 992534)
scalamusa@fortheinjured.com
Geoff S. Stahl (FBN 89240)
gstahl@fortheinjured.com
Rachel A. Bentley (FBN 106870)
rbentley@fortheinjured.com
4114 Northlake Boulevard
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050

**EDELSBERG LAW, P.A.**
Scott Edelsberg (FBN 100537)
scott@edelsberglaw.com
20900 NE 30th Ave., #417
Aventura, FL 33180
Telephone: (786) 289-9471

*Attorneys for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 3rd day of January, 2022, a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of filing will be served on all parties by operation of the Court's EM/ECF system, and parties may access this filing through the Court's CM/ECF system.

  <u>/s/ Jason H. Alperstein</u><br>
  JASON H. ALPERSTEIN
